FILED
COURT OF APPEALS
DIVISION II

2013 AUG 13 AM 10: 27

STATE OF WASHINGTON

BY_____
          DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SUE ANN GORMAN, a single person,<br><br>Respondent/Cross Appellant,<br><br>v.<br><br>PIERCE COUNTY, a county corporation; SHELLIE R. WILSON and "JOHN DOE" WILSON, husband and wife and the marital community composed thereof; ZACHARY MARTIN and "JANE DOE" MARTIN, husband and wife and the marital community composed thereof; and JACQUELINE EVANS-HUBBARD and "JOHN DOE" HUBBARD, husband and wife and the marital community composed thereof,<br><br>Appellants/Cross Respondents. | No. 42502-5-II<br>consolidated with<br>No. 42594-7-II<br><br><br>PUBLISHED OPINION |

PENOYAR, J. — Two dogs entered Sue Ann Gorman's house through an open door and mauled her in her bedroom. Invoking a statute imposing strict liability for dog-bite injuries, Gorman sued the dog owners, Shellie Wilson, Zachary Martin, and Jacqueline Evans-Hubbard. Gorman also sued Pierce County for negligently responding to complaints about the dogs before the attack. Pierce County invoked the public duty doctrine and sought dismissal of the claims against it, but the trial court ruled that the failure to enforce exception applied. A jury found all defendants liable and also found that Gorman's actions contributed to her injuries. Pierce County appeals, arguing that (1) the "failure to enforce" exception to the public duty doctrine does not apply, (2) the jury instructions misstated Pierce County's duty of care, and (3) the trial court erroneously admitted evidence of prior complaints about Wilson's other dogs. Gorman cross appeals, arguing that (4) the trial court erred by denying her motions for judgment as a matter of law, (5) the trial court erred by failing to give the emergency doctrine instruction, and

(6) insufficient evidence supports the jury's verdict on contributory fault. Because Pierce County had a mandatory duty to act, we affirm the trial court's determination that the failure to enforce exception applies. Additionally, the jury instructions properly stated the law and Pierce County opened the door to evidence about Wilson's other dogs. We further hold that Gorman failed to properly renew her motion for judgment as a matter of law and this argument is waived, Gorman failed to properly present the emergency doctrine instruction to the trial court, and there is sufficient evidence to support the jury's verdict that Gorman was contributorily negligent in incurring her injuries.

## FACTS

I.   SUBSTANTIVE FACTS

Shellie Wilson lived in Gig Harbor with her 16-year-old son, Zachary Martin. In 2006, they acquired a pit bull named Betty. Betty later had a litter of mixed-breed puppies, including one named Tank. In February 2007, Wilson and Martin gave Tank to Jacqueline Evans-Hubbard.

Two houses away from Wilson, Sue Gorman lived with her service dog, Misty. Gorman's next-door neighbor, Rick Russell, owned a Jack Russell terrier named Romeo.

On the cul-de-sac where Wilson, Gorman, and Russell lived, residents frequently let their dogs roam outdoors without a leash. Gorman left her sliding glass door open so that Misty and Romeo could come and go as they pleased.

Betty was the subject of several complaints to police and animal control officers. On August 31, 2006, Betty and another dog named Lola, belonging to Martin's houseguest, aggressively confronted Wilson's next-door neighbor in his yard, preventing the neighbor and his son from leaving their house for approximately 90 minutes. The neighbor called 911 and an

2

animal control officer contacted Wilson. On the basis of Wilson's admissions, the officer cited Wilson for allowing the dogs to run loose and failing to have a dog license. Wilson demanded that Martin's houseguest remove Lola from the house, and the houseguest complied.

A Pierce County ordinance allowed the county to classify a dog as "potentially dangerous" if the county had probable cause to believe the dog (1) bit a person or animal, (2) chased or approached a person "in a menacing fashion or apparent attitude of attack," or (3) was known to otherwise threaten the safety of humans or animals. Former Pierce County Code (PCC) 6.02.010(T) (2007). The county had a duty to evaluate a dog to determine if the dog was potentially dangerous if it had (1) a complainant's written statement that the dog met the code's definition, (2) a report of a dog bite, (3) testimony of an animal control or law enforcement officer who observed the dog, or (4) "other substantial evidence." RP at 964; Former PCC 6.07.010(A) (2007). In deciding to classify a dog, the county could consider prior complaints about other dogs that had previously belonged to the same owner. After classification, the dog's owner would be required to keep the dog confined, even during the pendency of an appeal. The county would be required to seize any potentially dangerous dog that violated any restriction imposed on potentially dangerous dogs.

During a three-week period in 2007, Pierce County received three more complaints about incidents involving Betty. On February 10, 2007, as Gorman returned from the grocery store, Betty chased Gorman and Misty, Gorman's service dog, into Gorman's house. Fifteen minutes later, Gorman tried to retrieve her groceries from the car but Betty again confronted her. Gorman commanded Betty to leave and kicked at her, but Betty bit Gorman's pant leg. Using a stick she grabbed from a pile in the yard, Gorman fended Betty off until retreating to safety inside her house. Gorman then called 911, but Betty left before a sheriff's deputy arrived an

hour later. Finding no one home at Wilson's house, the deputy advised Gorman to call animal control the following morning. Gorman testified that she called animal control and left a message, but she did not receive a return call and did not call again. Animal control had no record of Gorman's call.

The second complaint followed an incident on February 22, 2007. Russell called animal control to report Betty and another loose dog chasing a child on rollerblades.[1] An animal control officer arrived the following day but found no one at Wilson's home. The officer left a note on the door but Wilson and Martin did not respond. The officer also mailed Russell a form to provide a written statement. Russell did not provide a statement until six months later, after the dogs attacked Gorman.

Gorman made the third complaint on March 1, 2007. Betty chased Misty into Gorman's house and proceeded to jump aggressively at Gorman's sliding glass door. Gorman called 911, but Betty again had left by the time a deputy arrived. About 30 minutes later, the deputy and Martin appeared at Gorman's house; Martin then apologized to Gorman, denied Betty's involvement, and promised to fix Wilson's fence. The deputy had Gorman and Martin exchange phone numbers and encouraged Gorman to contact Martin directly in the future.

Wilson owned other dogs before Betty, and Pierce County records showed 10 complaints about Wilson's other dogs. Based on Wilson's prior history, an animal control expert later opined that Pierce County could have declared Betty potentially dangerous after the August 31, 2006, incident with Wilson's next-door neighbor. The expert also opined that Pierce County

---

[1] There was conflicting testimony on whether a second dog was present and, if so, whether it was Tank.

4

*should* have declared Betty potentially dangerous after any of the three incidents on February 10, February 22, and March 1, 2007.

Betty's aggressive behavior continued, but Pierce County did not receive further complaints. Gorman called Martin about 10 times regarding various incidents, but Martin never responded. During an incident in July 2007, Betty and Tank both entered Gorman's house through the open sliding glass door. Gorman believed Betty and Tank had come to confront Misty and Romeo, but Gorman got the dogs to leave peacefully.

On August 17, 2007, Evans-Hubbard, Tank's owner, left for two weeks. While she was gone, Evans-Hubbard left Tank with Wilson. At the time, Tank was six to eight months old.

At approximately 8:22 A.M. on August 21, 2007, Betty and Tank entered Gorman's house through the sliding glass door, which Gorman had left open for the night. Gorman, who was in her bedroom with Misty and Romeo, awoke to the sounds of Betty and Tank snarling. Misty, Gorman's service dog, ran outside to safety.

Betty and Tank then entered Gorman's bedroom and jumped onto her bed. Betty bit Gorman on the left arm. Romeo then jumped off the bed and was mauled by both Betty and Tank.

Gorman tried to protect Romeo. She tried to lift Romeo, but Betty and Tank bit both her hands. Gorman retrieved a gun from her nightstand, but the gun misfired. She threw the gun at the dogs and hit them with her walking stick to no avail. Gorman then managed to pick up Romeo, put him in the closet, and close the door, while Betty repeatedly bit Gorman's face, breasts, and hands. Tank forced the closet door open and, with Betty, began shaking Romeo. Gorman fled the house and closed the sliding glass door behind her to trap the dogs inside. She then called 911.

Gorman suffered serious injuries from 20 to 30 dog bites; she required hospitalization and multiple surgeries. Romeo, the Jack Russell terrier, died from his injuries. Betty and Tank were later euthanized. Wilson and Martin pleaded guilty to criminal charges. They were sentenced to probation and ordered to pay restitution.

II.    PROCEDURAL FACTS

Gorman then filed this suit, claiming that (1) Wilson, Martin, and Evans-Hubbard were strictly liable for the harm their dogs caused Gorman[2] and (2) Pierce County negligently failed to take appropriate action in response to the complaints about the dogs before the attack. Wilson, Martin, and Evans-Hubbard admitted liability, but Pierce County did not. Pierce County raised comparative fault as an affirmative defense.

Before trial, Gorman sought permission to introduce Pierce County records showing 10 complaints about other dogs Wilson owned before she acquired Betty. The trial court allowed testimony that 10 complaints were made, but it prohibited any testimony about the incidents alleged in the complaints. However, during cross-examination of an animal control officer, counsel for Pierce County asked "why there wasn't sufficient evidence [in the 10 prior complaints] to declare those dogs potentially dangerous?" Report of Proceedings (RP) (Aug. 3, 2011) at 990. The officer's response suggested that the complaints involved leash law violations, rather than threatening behavior. But on re-direct examination, Gorman's counsel elicited testimony that, in three of these incidents, a dog unsuccessfully attempted to attack a person.

Pierce County moved for summary judgment dismissing it from the case, contending that the public duty doctrine shielded it from liability because the county owed no legal duty to Gorman individually. The trial court denied the motion, allowing the negligence claim to

---

[2] RCW 16.08.040(1) makes dog owners strictly liable for injuries their dogs cause.

proceed under the failure to enforce exception to the public duty doctrine.[3] When Gorman rested

at trial, Pierce County unsuccessfully moved for judgment as a matter of law on the same

grounds presented in the summary judgment motion.

When all defendants rested, Gorman moved for judgment as a matter of law, arguing that

the evidence was insufficient to show that she breached a duty and, thus, her negligence could

not have contributed to her injuries. The trial court denied the motion.

The jury found all defendants, including Pierce County, liable to Gorman. The jury also

found that Gorman's fault contributed to her injuries.[4] After the verdict, Gorman renewed her

earlier motion for judgment as a matter of law and argued that she had no legal duty to close her

sliding door.

Pierce County appeals the denial of its motion for judgment as a matter of law, while also

arguing instructional and evidentiary error. Gorman cross appeals the jury's verdict finding her

at fault for contributing to her injuries.

## ANALYSIS

### I. THE PUBLIC DUTY DOCTRINE

Pierce County argues that the trial court erred by denying its motion for judgment as a

matter of law on the negligence claim because, under the public duty doctrine, Pierce County

owed no duty of care to Gorman. Gorman argues that (1) the public duty doctrine is contrary to

law or, in the alternative; (2) the failure to enforce exception to the public duty doctrine applies

---

[3] Before trial, Gorman also argued, and the trial court agreed, that the special relationship exception to the public duty doctrine applied. But Gorman abandoned this theory by offering to withdraw her proposed jury instruction on the special relationship exception.

[4] The jury apportioned fault as follows: 52 percent to Wilson and Martin, 42 percent to Pierce County, 5 percent to Evans-Hubbard, and 1 percent to Gorman.

here. We hold that the public duty doctrine is not contrary to law and that the failure to enforce exception applies here.

We review a trial court's denial of a CR 50 motion for judgment as a matter of law de novo, engaging in the same inquiry as the trial court. *Schmidt v. Coogan*, 162 Wn.2d 488, 491, 173 P.3d 273 (2007). Judgment as a matter of law is proper only when, viewing the evidence in the light most favorable to the nonmoving party, substantial evidence cannot support a verdict for the nonmoving party. *Schmidt*, 162 Wn.2d at 491, 493.

Like any other defendant, a government is not liable for negligence unless it breached a legal duty of care. *Osborn v. Mason County*, 157 Wn.2d 18, 27-28, 134 P.3d 197 (2006). Under the public duty doctrine, a government's obligation *to the public* is not a legal duty of care; instead, a government can be liable only for breaching a legal duty owed *individually to the plaintiff*. *Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 785, 30 P.3d 1261 (2001) (quoting *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988)). However, the public duty doctrine is subject to four exceptions: (1) the legislative intent exception, (2) the failure to enforce exception, (3) the rescue doctrine, and (4) the special relationship exception. *Babcock*, 144 Wn.2d at 786. Whether, in light of the public duty doctrine and its exceptions, a government defendant owed the plaintiff a legal duty is a question of law reviewed de novo. *Vergeson v. Kitsap County*, 145 Wn. App. 526, 534, 186 P.3d 1140 (2008).

8

A.     The Public Duty Doctrine Is Not Contrary to Law

Gorman asks us to abolish the public duty doctrine and instead to apply a different test.[5] We decline to do so because our Supreme Court precedent approving the public duty doctrine binds us.

Urging abolition of the public duty doctrine, Gorman contends that it is incompatible with the legislature's abrogation of sovereign immunity. But our Supreme Court has already rejected this contention. *Chambers-Castanes v. King County*, 100 Wn.2d 275, 287-88, 669 P.2d 451 (1983).[6] Instead, our Supreme Court has repeatedly applied the public duty doctrine to define the duty owed by government defendants in negligence actions. *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 886 n.3, 288 P.3d 328 (2012) (Chambers, J., concurring and joined by a majority of the justices) (listing 29 instances).[7] We are bound to follow our Supreme Court's precedents and have no authority to abolish them. *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 590, 146 P.3d 423 (2006).

---

[5] Gorman proposes this argument as an alternative ground on which we may affirm the trial court. *See* RAP 2.5(a).

[6] "Abrogation of the doctrine of sovereign immunity did not *create* duties where none existed before. It merely permitted suits against governmental entities that were previously immune from suit." *Chambers-Castanes*, 100 Wn.2d at 288 (emphasis in original). Gorman ignores the majority's opinion in *Chambers-Castanes* but quotes the separate concurring opinion of Justice Utter, the only justice who would have rejected the public duty doctrine in that case.

[7] Our Supreme Court has often described the public duty doctrine as a "focusing tool" used to examine a fundamental element in any negligence action: whether the defendant owed a duty of care to the plaintiff. *Munich*, 175 Wn.2d at 878. But the public duty doctrine is treated as a rule of law. *See Munich*, 175 Wn.2d at 877-88.

Gorman next urges us to apply, instead of the public duty doctrine, the four-part test set out in *Evangelical United Bretheren Church of Adna v. State*, 67 Wn.2d 246, 255, 407 P.2d 440 (1966).[8] But Gorman misapprehends the purpose of the *Evangelical* test, which recognizes limited grounds for governmental immunity flowing from the separation of powers. *See* 67 Wn.2d at 253-55. The *Evangelical* test determines whether a particular discretionary act is so rooted in governing that it cannot be tortious, no matter how "unwise, unpopular, mistaken, or neglectful [it] might be." 67 Wn.2d at 253. Thus, the *Evangelical* test prevents courts from deciding whether the coordinate branches of government have made the wrong policies. *King v. City of Seattle*, 84 Wn.2d 239, 246, 525 P.2d 228 (1974), *overruled on other grounds by City of Seattle v. Blume*, 134 Wn.2d 243, 947 P.2d 223 (1997). The *Evangelical* test is inapposite to the issue here: whether Pierce County owed a legal duty to Gorman. Gorman's argument fails.

B.      The Failure to Enforce Exception Applies

The parties dispute only whether the failure to enforce exception to the public duty doctrine applies in this case. We hold that it does.

Under the failure to enforce exception, a government's obligation to the general public becomes a legal duty owed to the plaintiff when (1) government agents who are responsible for enforcing statutory requirements actually know of a statutory violation, (2) the government agents have a statutory duty to take corrective action but fail to do so, and (3) the plaintiff is within the class the statute intended to protect. *Bailey v. Town of Forks*, 108 Wn.2d 262, 268, 737 P.2d 1257 (1987). The plaintiff has the burden to establish each element of the failure to

---

[8] The *Evangelical* test asks whether (1) an allegedly tortious act necessarily involves a basic governmental policy, program, or objective; (2) the act is essential to implementing or achieving such a policy, program, or objective; (3) the act requires the exercise of policymaking judgment or expertise; and (4) a constitution or law authorizes the government actor to do the act. 67 Wn.2d at 255.

enforce exception, and the court must construe the exception narrowly. *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 531, 799 P.2d 250 (1990).

Contesting only the second element, Pierce County argues that it had no statutory duty to take corrective action.[9] Gorman contends that former PCC 6.07.010(A) created a duty to classify potentially dangerous dogs. We agree with Gorman.

An ordinance creates a statutory duty to take corrective action if it mandates a specific action when the ordinance is violated. *Pierce v. Yakima County*, 161 Wn. App. 791, 800, 251 P.3d 270, *review denied*, 172 Wn.2d 1017 (2011); *Donohoe v. State*, 135 Wn. App. 824, 849, 142 P.3d 654 (2006). Gorman argues that former PCC 6.07.010(A) creates a statutory duty because the word "shall" expresses a mandatory directive. Br. of Resp't at 38.

To determine whether the ordinance is mandatory, we must apply the rules of statutory interpretation to the ordinance. *See City of Puyallup v. Pac. Nw. Bell Tel. Co.*, 98 Wn.2d 443, 448, 656 P.2d 1035 (1982). When interpreting a statute, our fundamental objective is to ascertain and carry out the legislature's intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). If the statute's meaning is plain, then we must give effect to that plain meaning. *Campbell & Gwinn*, 146 Wn.2d at 9-10. But if the statute has more than one reasonable meaning, the statute is ambiguous and statutory construction is necessary. *Campbell & Gwinn*, 146 Wn.2d at 12.

---

[9] Pierce County does not argue that it took corrective action. Thus, if Pierce County had a duty to take corrective action, it failed to perform the duty and the second element is satisfied.

A statute's plain meaning derives from all words the legislature has used in the statute and related statutes. *Campbell & Gwinn*, 146 Wn.2d at 11-12. We may also consider background facts that were presumably known to the legislature when enacting the statute. *Campbell & Gwinn*, 146 Wn.2d at 11.

Here, former PCC 6.07.010(A) provided:

> The County or the County's designee *shall* classify potentially dangerous dogs. The County or the County's designee *may* find and declare an animal potentially dangerous if an animal care and control officer has probable cause to believe that the animal falls within the definitions [of "potentially dangerous dog"[10]] set forth in [PCC] 6.02.010[T][11]. The finding must be based upon:
> 1. The written complaint of a citizen who is willing to testify that the animal has acted in a manner which causes it to fall within the definition of [PCC] 6.02.010[T]; or
> 2. Dog bite reports filed with the County or the County's designee; or
> 3. Actions of the dog witnessed by any animal control officer or law enforcement officer; or
> 4. Other substantial evidence.

(Emphasis added.)

Where a statute uses both "shall" and "may," we presume that the clause using "shall" is mandatory and the clause using "may" is permissive. *Scannell v. City of Seattle*, 97 Wn.2d 701, 704, 648 P.2d 435 (1982). Here, the ordinance mandated some actions ("shall") and made others discretionary ("may"). For instance, after inquiry, Pierce County had discretion to classify a dog as potentially dangerous. Former PCC 6.07.010(A) ("The County . . . *may* find and declare an

---

[10] Former PCC 6.02.010(T) defined a "Potentially Dangerous Dog" as

> any dog that when unprovoked: (a) Inflicts bites on a human, domestic animal, or livestock . . . (b) chases or approaches a person . . . in a menacing fashion or apparent attitude of attack, or (c) any dog with a known propensity, tendency, or disposition to attack unprovoked or to cause injury or otherwise to threaten the safety of humans, domestic animal, or livestock . . . .

[11] The ordinance actually cites former PCC 6.02.010(Q) (2007), but that subsection defined "livestock."

12

animal potentially dangerous . . . .") (emphasis added). But, if the county received reports of a potentially dangerous dog, it had a duty to apply the classification process to that dog. Former PCC 6.07.010(A) ("The County . . . *shall* classify potentially dangerous dogs.") (emphasis added). The legislature's use of "shall" was a clear directive to apply the classification process to dogs that were likely potentially dangerous. Although the county had discretion to classify or not classify any particular dog as potentially dangerous, it had a duty to at least apply the classification process to any apparently valid report of a dangerous dog. The county had a duty to act.[12]

Division One has held that the failure to enforce exception applies in comparable circumstances. *Livingston v. City of Everett*, 50 Wn. App. 655, 659, 751 P.2d 1199 (1988). In *Livingston*, the city animal control department had received numerous complaints about three dogs running loose and behaving aggressively. 50 Wn. App. at 657. Animal control eventually impounded the dogs but released them to their owner the next day. *Livingston*, 50 Wn. App. at 657. A few weeks later, the dogs attacked a young boy. *Livingston*, 50 Wn. App. at 657. The Everett municipal code provided that animals in violation of the code may be impounded and that impounded animals shall be released to their owners only if the animal control officer determines that the animal is not dangerous. *Livingston*, 50 Wn. App. at 658. The officer never evaluated the dogs' dangerousness but released them to their owner anyway. *Livingston*, 50 Wn. App. at 657. The officer violated his statutory duty to exercise his discretion by evaluating the dogs' dangerousness before releasing them. *Livingston*, 50 Wn. App. at 659. Accordingly, the failure to enforce exception applied and the city could be found liable for injuries the dogs

---

[12] The dissent reads the ordinance as a whole to be discretionary, while our view is that certain provisions are mandatory and others discretionary.

13

caused after their release. *Livingston*, 50 Wn. App. at 659. Similarly, here, Pierce County received multiple complaints about Wilson's dogs but failed to evaluate the dogs' dangerousness despite a statute requiring it to act.

Pierce County argues that this case is similar to *Pierce*, 161 Wn. App. 791. In *Pierce*, Division Three held that the county did not have a mandatory duty to act despite the presence of "shall" in a county code provision. 161 Wn. App. at 801. There, the plaintiff sued the county for negligently inspecting his gas line after he was injured in a gas explosion. *Pierce*, 161 Wn. App. at 796. He argued that the following code provision imposed a mandatory duty on the county:

> [T]he building official . . . **shall** make or cause to be made any necessary inspections and **shall** either approve the portion of the construction as completed or **shall** notify the permit holder wherein the same fails to comply with this code.

*Pierce*, 161 Wn. App. at 799 (quoting Internal Residential Code (IRC) § R109.1 (2006)). In response, Yakima County cited other code provisions providing that, when an official observes a code violation, he *has authority* to authorize disconnection or serve a notice of violation. *Pierce*, 161 Wn. App. at 799 (citing IRC §§ R111.3, R113.2). Division Three held that the code did not create a mandatory duty to take a specific enforcement action. *Pierce*, 161 Wn. App. at 801. If officials observed a code violation, they had authority—but were not required—to authorize disconnection or serve notices of violation. *Pierce*, 161 Wn. App. at 799.

This case is distinguishable from *Pierce*. Unlike in *Pierce*, the county here is required to act if it observes a violation of the potentially dangerous dog restrictions. In *Pierce*, the ordinances only required Yakima County officials to make inspections and issue approvals or denials. The ordinances did not require the county to take any enforcement action. Here, while some of the steps in the process are discretionary, the code did require Pierce County to take action if certain conditions existed. If the county was made aware of a likely potentially

14

dangerous dog, it had a duty to evaluate the dog to determine if it was potentially dangerous. Then, if the dog was declared potentially dangerous, the code mandated that the county take corrective action, seizing and impounding any dog whose owner allowed it to violate the restrictions placed upon it. Former PCC 6.07.040 (2007) ("any potentially dangerous dog which is in violation of . . . this Code or restrictions imposed as part of a declaration as a potentially dangerous dog, shall be seized and impounded"). The *Pierce* case is not helpful where, as here, some mandatory duties exist.

We agree with Gorman and the trial court and hold that the failure to enforce exception applies here.

II.     JURY INSTRUCTIONS ON PIERCE COUNTY'S DUTY TO GORMAN

Pierce County also argues that the trial court's instruction 5 misstated the law by stating the county had a legal duty to protect the public and a legal duty to confiscate and confine Betty. We hold that this argument misrepresents instruction 5 and that the jury instructions were proper.[13]

---

[13] In addition, Pierce County argues that jury instructions erroneously stated that (1) it also had a legal duty to "control" a potentially dangerous dog and (2) Gorman could carry her burden to prove Pierce County's liability by showing that her injury was proximately caused by Pierce County's negligence "and/or the fault of the [dog owners]." Br. of Appellant at 32, 35. But Gorman asserts that Pierce County did not preserve these arguments for appeal. We agree with Gorman. Pierce County concedes its failure to object to this portion of the duty of care instruction, and it does not contest its asserted failure to object to the burden of proof instruction. Without adequate objections at trial, the arguments are waived. *See* RAP 2.5(a); *Stewart v. State,* 92 Wn.2d 285, 298-99, 597 P.2d 101 (1979).

We review claimed errors of law in jury instructions de novo.[14] *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995). Jury instructions are not erroneous if they allow the parties to argue their theories of the case, they do not mislead the jury, and, when read as a whole, they properly state the applicable law. *Keller v. City of Spokane*, 146 Wn.2d 237, 249, 44 P.3d 845 (2002) (quoting *Bodin v. City of Stanwood*, 130 Wn.2d 726, 732, 927 P.2d 240 (1996)). Read as a whole, the jury instructions here properly state the applicable law.

Instruction 5 stated that it was "merely a summary of the claims of the parties." Clerk's Papers (CP) at 882. The instruction summarized Gorman's negligence claim as follows:

> The plaintiff Sue Gorman claims that the defendant Pierce County was negligent in one or more of the following respects:
> (1) failing to classify and control a potentially dangerous dog;
> (2) failing to protect the public from a potentially dangerous dog;
> (3) failing to confiscate and confine a potentially dangerous dog.

CP at 881. On its face, this instruction describes the claims Gorman presented during the trial, not Pierce County's legal duty. But other instructions correctly explained Pierce County's legal duty. Instruction 15 included the language from former PCC 6.07.010(A):

> The County or the County's designee shall classify potentially dangerous dogs. The County or the County's designee may find and declare an animal potentially dangerous if an animal care and control office [sic] has probable cause to believe that the animal falls within the definitions [of "potentially dangerous dog"] set forth in [PCC] 6.02.010[(T)]. The finding must be based upon:
> 1. The written complaint of a citizen who is willing to testify that the animal has acted in a manner which causes it to fall within the definition of [PCC] 6.02.010[(T)]; or
> 2. Dog bite reports filed with the County or County's designee; or
> 3. Actions of the dog witnessed by any animal control officer or law enforcement officer; or
> 4. Other substantial evidence.

---

[14] Gorman asserts that the standard of review is whether the trial court's decision is manifestly unreasonable or based on untenable reasons or grounds. This assertion is incorrect. That standard applies when the appellant assigns error to the trial court's choices about the number of instructions to give or the particular words to use. *Hue*, 127 Wn.2d at 92 n.23.

CP at 892. Instruction 17 stated,

> The Pierce County Code provides that after a dog is declared to be potentially dangerous, the person owning or having care of such dog shall not allow the dog to be unconfined on the premises of such person, or go beyond the premises of such person unless the dog is securely leashed and humanely muzzled or otherwise securely restrained.
>
> A potentially dangerous dog in violation of these provisions shall be seized and impounded.

CP at 894.

In defining negligence, instruction 6 also defined the duty of ordinary care:

> Negligence is the failure to exercise ordinary care. It is the doing of some act that a reasonably careful person would not do under the same or similar circumstances or the failure to do some act that a reasonably careful person would have done under the same or similar circumstances.
>
> Ordinary care means the care a reasonably careful person would exercise under the same or similar circumstances.

CP at 883. In addition, the trial court clearly instructed the jury that Pierce County was liable only if it had been *negligent* by failing to act in one of the ways Gorman claimed. Thus, the instructions required the jury not just to decide whether Pierce County failed to act, but whether the failure was reasonable under the circumstances. Accordingly, we hold that the jury instructions properly stated the legal duty of ordinary care.

III.    EVIDENCE OF PRIOR COMPLAINTS ABOUT WILSON'S OTHER DOGS

Pierce County next argues that the trial court admitted evidence of prior complaints about Wilson's dogs other than Betty, even though this evidence was irrelevant and unfairly prejudicial. We disagree.

In general, we review a trial court's ruling on the admissibility of evidence to determine if its decision was manifestly unreasonable, exercised on untenable grounds, or based on untenable reasons. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 283, 840 P.2d 860 (1992);

*Wilson v. Horsley*, 137 Wn.2d 500, 505, 974 P.2d 316 (1999). A trial court may admit evidence only if it is relevant. ER 402. Relevant evidence has any tendency to make a fact of consequence more likely or less likely; this definition sets a low threshold. ER 401; *Kappleman v. Lutz*, 167 Wn.2d 1, 9, 217 P.3d 286 (2009). However, a trial court may exclude relevant evidence if the risk of unfair prejudice, confusion of the issues, misleading the jury, or waste of time substantially outweighs its probative value. ER 403.

The evidence here became admissible only after Pierce County opened the door to it. Before trial, the trial court permitted Gorman to elicit testimony that the county had received 10 complaints about Wilson's other dogs, but the trial court prohibited testimony about the reasons for those complaints. The trial court explained that the probative value was outweighed by the risks that (1) mini-trials on the veracity of each complaint would waste time and (2) the details of incidents involving other dogs would unfairly prejudice Pierce County.

But while questioning a county animal control officer, counsel for Pierce County asked why the prior complaints had not led the county to pursue a declaration of potential dangerousness. The officer explained that the prior complaints primarily concerned dogs off leash or excessive barking, but "[t]hey were not all dogs chasing individuals or anything of that nature." RP (Aug. 3, 2011) at 990. Counsel then elicited testimony that "a history of a dog owner who had previous complaints of leash law violations" would not support a declaration of potential dangerousness. RP (Aug. 3, 2011) at 991. The trial court ruled that this questioning opened the door to evidence rebutting the suggestion that the prior complaints did not involve dangerous dog behavior, but it still prohibited questioning about the details. Accordingly, Gorman elicited testimony from the same witness that three of the prior complaints involved attempted attacks.

18

The trial court did not err by admitting this testimony. The evidence was relevant to the county's knowledge that at least one of Wilson's dogs posed a risk. *See* ER 401. And the trial court's refusal to allow questioning on the details reduced the effect of any unfair prejudice, while admitting evidence that was probative of the reasonableness of the county's explanation for declining to pursue a potentially dangerous dog declaration. *See* ER 403. Accordingly, this argument fails.

IV.    GORMAN'S LEGAL DUTY

In her cross appeal, Gorman argues that the trial court erred by denying her renewed motion for judgment as a matter of law, which sought to set aside the jury's finding of contributory fault on the ground that Gorman owed no legal duty. Evans-Hubbard asserts that Gorman waived this argument by failing to make it in her original motion for judgment as a matter of law. We agree with Evans-Hubbard.

We will not consider an appeal from a trial court's denial of a CR 50 motion for judgment as a matter of law unless the appellant has renewed the motion after the verdict. *Washburn v. City of Federal Way*, 169 Wn. App. 588, 592, 283 P.3d 567 (2012), *review granted*, 176 Wn.2d 1010 (2013); *see* CR 50(b). To preserve the opportunity to renew a CR 50 motion after the verdict, a party must move for judgment as a matter of law before the trial court submits the case to the jury. *Hanks v. Grace*, 167 Wn. App. 542, 552-53, 273 P.3d 1029, *review denied*, 175 Wn.2d 1017 (2012); *see* CR 50(a).

On the issue of her own comparative fault, Gorman asserted in her original CR 50 motion that she bore no fault because the *evidence was insufficient* to show that leaving the door open was a breach of her legal duty. For the first time in her renewed motion, Gorman argued that, *as a matter of law*, she had no legal duty to close the door. This argument is not proper because a

renewed CR 50 motion cannot present new legal theories that were not argued before the verdict. *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 193 n.20, 23 P.3d 440 (2001), *overruled on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006); *Browne v. Cassidy*, 46 Wn. App. 267, 269, 728 P.2d 1388 (1986). Gorman did not preserve her argument for appeal, so it fails.

## V. EMERGENCY DOCTRINE INSTRUCTION

Gorman next argues that the trial court erred by declining to instruct the jury on the emergency doctrine. We disagree because Gorman failed to preserve any challenge to the omission of this instruction.

To challenge the trial court's failure to give a jury instruction, an appellant must have proposed the instruction in the trial court. *McGarvey v. City of Seattle*, 62 Wn.2d 524, 533, 384 P.2d 127 (1963). In general, a party requesting an instruction that appears in the Washington Pattern Instructions must propose the instruction in writing. CR 51(d)(1); *Balandzich v. Demeroto*, 10 Wn. App. 718, 722, 519 P.2d 994 (1974). However, a party may request a Washington Pattern Instruction simply by referring to the instruction's published number if the superior court has adopted a local rule permitting that procedure. CR 51(d)(3).

Gorman's request for the emergency doctrine instruction did not comply with CR 51(d). She did not propose the instruction in writing. *See* CP at 810-37, 1416-26. Instead, she orally requested 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 12.02, at 142 (5th ed. 2005), the pattern emergency doctrine instruction, and she took exception to the trial court's refusal to give it. But Gorman has not identified any applicable local rule allowing her request by reference to the published number. Therefore, Gorman failed to propose the instruction in a manner consistent with CR 51(d).

20

## VI.  SUFFICIENCY OF THE EVIDENCE

Lastly, Gorman argues that the evidence was insufficient to support the jury's verdict that (1) she breached her duty and (2) her negligence was a proximate cause of her injury.  Br. of Resp't at 64-72.  We disagree.

We cannot substitute our judgment for that of the jury.  *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 108, 864 P.2d 937 (1994) (quoting *State v. O'Connell*, 83 Wn.2d 797, 839, 523 P.2d 872 (1974)).  Accordingly, we cannot overturn the jury's verdict unless it is clearly unsupported by substantial evidence, i.e., evidence that, if believed, would support the verdict. *Burnside*, 123 Wn.2d at 107-08 (quoting *O'Connell*, 83 Wn.2d at 839).  When reviewing a jury verdict for substantial evidence, we must consider all evidence and draw all reasonable inferences in the light most favorable to the verdict.  *Ketchum v. Wood*, 73 Wn.2d 335, 336, 438 P.2d 596 (1968).

In order to prove contributory negligence, the defendant must show that the plaintiff had a duty to exercise reasonable care for her own safety, that she failed to exercise such care, and that this failure is a cause of her injuries. *Alston v. Blythe*, 88 Wn. App. 26, 32 n.8, 943 P.2d 692 (1997).  Contributory negligence is usually a factual question for the jury. *Jaeger v. Cleaver Constr., Inc.*, 148 Wn. App. 698, 713, 201 P.3d 1028 (2009).

Substantial evidence supports the jury's finding that Gorman breached her duty by failing to exercise the care a reasonable person would exercise under the circumstances.  Although Gorman believed Betty was an aggressive and vicious dog and Gorman knew that Betty and Tank had previously entered her home through the open door, Gorman testified that she left the door open on the night of her attack.  Pierce County also claimed that Gorman unreasonably chose to save Romeo rather than flee for her own safety.  Because Gorman testified that she

21

indeed tried to save Romeo, there was sufficient evidence for the jury to consider whether this decision was reasonable.

Substantial evidence also supports the jury's finding that Gorman's conduct was a proximate cause of her injuries. Gorman testified that the pit bulls entered her house through the open door on the night of her attack. Gorman also testified that while trying to rescue Romeo, she suffered further injuries to her hands and wrists. Therefore substantial evidence supports the jury's verdict on contributory fault.

Although we are sympathetic to Gorman's argument that she did not owe a legal duty to close her door, as we discussed above, she did not preserve this argument for appeal. Nor does she make a supported argument on appeal that the trial court erred by instructing the jury on contributory negligence. Therefore, any contributory negligence instructions became the law of the case. *See Washburn*, 169 Wn. App. at 605 (stating that the failure to appeal an allegedly erroneous instruction makes that instruction the law of the case). Again, we cannot substitute our judgment for the jury's. Because contributory negligence became the law of the case and because the facts support the jury's finding of contributory negligence, Gorman's argument fails.

Affirmed.

_____
Penoyar, J.

I concur:

_____
Van Deren, J.

22

WORSWICK, C.J. (dissenting in part) — I concur with the majority's analysis in sections II through VI regarding jury instructions on Pierce County's duty, evidence of prior complaints, denial of Sue Ann Gorman's motion for judgment as a matter of law, the emergency doctrine instruction, and sufficiency of the evidence. But because the majority misconstrues the county ordinance and misapplies the public duty doctrine, I respectfully dissent from the majority's conclusion in section I.B that the failure to enforce exception to the public duty doctrine applies here.

When a governmental entity is sued for negligence, courts employ the public duty doctrine to determine whether a duty is owed to the general public or whether that duty is owed to a particular individual. *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 878, 288 P.3d 328 (2012). A duty owed to the general public is not an actionable legal duty in a negligence suit. *Bailey v. Town of Forks*, 108 Wn.2d 262, 266, 737 P.2d 1257 (1987). But the public duty doctrine is subject to several exceptions, including the failure to enforce exception. *Bailey*, 108 Wn.2d at 268.

For the failure to enforce exception to apply, the plaintiff must prove, inter alia, that government agents have a statutory duty to take corrective action. *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 531, 799 P.2d 250 (1990). Thus, the failure to enforce exception "applies only where there is a mandatory duty to take a specific action to correct a known statutory violation." *Donohoe v. State*, 135 Wn. App. 824, 849, 142 P.3d 654 (2006). But no such duty exists if the statute confers broad discretion about whether and how to act. *Donohoe*, 135 Wn. App. at 849. In addition, we must construe the failure to enforce exception narrowly. *Atherton*, 115 Wn.2d at 531.

Here I disagree with the majority's conclusion that former Pierce County Code (PCC) 6.07.010(A) (2007) created a statutory duty to take the corrective action of classifying potentially dangerous dogs. The majority reaches this conclusion after (1) misinterpreting the ordinance and (2) misapplying case law on the failure to enforce exception. In my view, the failure to enforce exception does not apply because the ordinance did not *mandate* action by the county.

1. *Interpretation of the Ordinance*

First, the majority misinterprets the plain meaning of the ordinance and incorrectly concludes that it expresses a mandatory directive. Here, former PCC 6.07.010(A) provided:

> The County or the County's designee shall classify potentially dangerous dogs. The County or the County's designee may find and declare an animal potentially dangerous if an animal care and control officer has probable cause to believe that the animal falls within the definitions [of "potentially dangerous dog"] set forth in [former PCC] 6.02.010[(T)[15]]. The finding must be based upon:
> 1. The written complaint of a citizen who is willing to testify that the animal has acted in a manner which causes it to fall within the definition of [PCC] 6.02.010[(T)]; or
> 2. Dog bite reports filed with the County or the County's designee; or
> 3. Actions of the dog witnessed by any animal control officer or law enforcement officer; or
> 4. Other substantial evidence.

The majority correctly states the rules of plain meaning analysis. A statute's plain meaning derives from all words the legislature has used in the statute and related statutes. *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 11-12, 43 P.3d 4 (2002). We may also consider background facts that were presumably known to the legislature when enacting the statute. *Campbell & Gwinn*, 146 Wn.2d at 11. Where, as here, a statute uses both "shall" and

---

[15] Apparently in error, former PCC 6.07.010(A) cited former PCC 6.02.010(Q) (2007). The current version of PCC 6.07.010(A) cites the definition of "potentially dangerous animal" in PCC 6.02.010(X).

"may," we presume that the clause using "shall" is mandatory and the clause using "may" is permissive. *Scannell v. City of Seattle*, 97 Wn.2d 701, 704, 648 P.2d 435 (1982).

But the majority's plain meaning analysis misapplies these rules. The majority appears to rely solely on the word "shall" to conclude that the ordinance "was a clear directive to apply the classification process to dogs that were likely potentially dangerous."[16] Majority at 13. But a plain meaning analysis requires us to consider "*all* that the Legislature has said in the statute." *Campbell & Gwinn*, 146 Wn.2d at 11 (emphasis added).

Read in its entirety with each word placed in context, the ordinance clearly *authorized*— but did not *require*—the county or its designee to classify potentially dangerous dogs. Former PCC 6.07.010(A). The ordinance stated that, when competent evidence supports a finding of probable cause to believe that a particular dog is a potentially dangerous dog, the county "*may find and declare*" the dog to be potentially dangerous. Former PCC 6.07.010(A) (emphasis added). But—as the majority concedes—the ordinance did not require the county to make a declaration; it gave the county discretion to do so. Accordingly, the ordinance did not mandate a specific action to correct a known statutory violation.

2. *Application of Case Law*

I also disagree with the majority's application of case law on the failure to enforce exception.

---

[16] In the majority's interpretation, the ordinance (1) requires the county to conduct an "inquiry" whenever it receives an "apparently valid report" that a dog is likely potentially dangerous, but (2) gives the county discretion, after completing the inquiry, to classify a particular dog as potentially dangerous. Majority at 12-13. Because the ordinance says nothing about inquiries into reports of potentially dangerous dogs, I believe the majority's inquiry requirement derives from a misinterpretation of the ordinance's plain meaning.

First, the majority misplaces its reliance on *Livingston v. City of Everett*, 50 Wn. App. 655, 751 P.2d 1199 (1988). In *Livingston*, the failure to enforce exception applied because the city violated a local law governing the release of impounded dogs to their owner. 50 Wn. App. at 658-59. There, the local law stated: "Any impounded animal shall be released to the owner . . . *if, in the judgment of the animal control officer in charge, such animal is not dangerous or unhealthy*.'" 50 Wn. App. at 658 (quoting former Everett Municipal Code § 6.04.140(E)(1)) (emphasis added). Because an animal control officer released impounded dogs without judging their dangerousness or health, the court held that the officer failed to exercise his discretion as the law required. 50 Wn. App. at 657, 659.

The ordinance here is so different that this case is not comparable to *Livingston*. In *Livingston*, when a dog owner sought the release of his dog from the pound, the city law mandated that the city determine the dog to be neither dangerous nor unhealthy. 50 Wn. App. at 658. In contrast, Pierce County's ordinance articulated *no* circumstances under which the county must determine whether a dog is potentially dangerous. *See* former PCC 6.07.010(A). And, even if a particular dog meets the definition of a potentially dangerous dog, the ordinance's use of the word "may" clearly gave the county broad discretion to declare or not to declare the dog potentially dangerous. Former PCC 6.07.010(A) ("The County . . . may find and declare an animal potentially dangerous" when competent evidence establishes probable cause to believe the animal is a potentially dangerous dog under former PCC 6.02.010(T)). *Livingston* is inapposite.

Further, the majority emphasizes that this case and *Livingston* are similar because both involve dogs that were the subject of multiple complaints. But the existence of multiple complaints is irrelevant to the failure to enforce exception: if the statutory language truly is

26

mandatory, then a *single* failure to take required action will violate the government's duty to enforce the statute. *See Bailey*, 108 Wn.2d at 269 (police officer failed a single time to detain a person who appeared in public to be incapacitated by alcohol); *Campbell v. City of Bellevue*, 85 Wn.2d 1, 5, 530 P.2d 234 (1975) (electrical inspector failed a single time to "immediately sever" an electrical system after observing that it did not comply with city code); *Livingston*, 50 Wn. App. at 659 (animal control officer failed a single time to determine whether an impounded dog was dangerous or unhealthy before releasing the dog; multiple complaints about the dog had no bearing on the failure to enforce exception). By appearing to base its decision on the county's *repeated* failures to take a discretionary action, the majority muddles the failure to enforce exception.

For her own part, Gorman relies on *King v. Hutson*, 97 Wn. App. 590, 987 P.2d 655 (1999), but that case is also unavailing. In *King*, a state law required the county to immediately confiscate any dangerous dog that had bitten a person or another animal.[17] 97 Wn. App. at 595. Based on the record, a jury could have found that the dog in *King* became a "dangerous dog" under state law when it attacked a neighbor. 97 Wn. App. at 596. The neighbor reported the attack to the police and prosecutor, but the prosecutor merely called the owner and advised that he could be arrested if he had committed a criminal act. 97 Wn. App. at 593. Over one month later, a police officer visited the owner and asked him to turn over the dog to be destroyed, but the owner refused and the officer took no further action. 97 Wn. App. at 593. The court in *King* held that the county's failure to enforce the state law exposed it to liability for any injury occurring as a result of its failure to confiscate a dangerous dog after the attack. 97 Wn. App. at

---

[17] State law governs "dangerous dogs," but it also directs municipalities and counties to regulate "potentially dangerous dogs." RCW 16.08.070(2), .090(2).

596. However, the county was not liable for the injuries the neighbor suffered during the attack, because the dog had not yet become a dangerous dog and therefore the state law imposed no mandatory duty on the county at that time. 97 Wn. App. at 595.

The situation here is similar to that *before* the attack in *King*. Because the two dogs here were not classified as potentially dangerous dogs, Pierce County had no mandatory duty. Accordingly, the failure to enforce exception does not apply and the county is not liable for injuries Gorman suffered during the attack.

For similar reasons, the majority fails to convincingly distinguish this case from *Pierce v. Yakima County*, 161 Wn. App. 791, 799-801, 251 P.3d 270, *review denied*, 172 Wn.2d 1017 (2011), a case in which a statute repeatedly used the word "shall" to confer authority and grant discretion, without creating a mandatory enforcement duty. The majority states that the county was required to seize and impound "'any potentially dangerous dog which is in violation of . . . [chapter 6.07 PCC] or restrictions imposed as part of a declaration as a potentially dangerous dog.'" Majority at 15 (quoting former PCC 6.07.040 (2007)). But this requirement applied only to dogs that have been declared potentially dangerous. Former PCC 6.07.040. Because the two dogs here were never declared potentially dangerous dogs, they did not "violate" restrictions applicable to potentially dangerous dogs. Therefore the county never had *the authority*—let alone a mandatory duty—to seize and impound the two dogs here under former PCC 6.07.040.

Finding otherwise, the majority accepts Gorman's contention that (1) the county *should have* declared Betty a potentially dangerous dog and (2) Betty violated restrictions that *would have applied if* the county had declared Betty a potentially dangerous dog. But this is a hypothetical, not actual, violation. Because former PCC 6.07.040 was never violated, I would hold that Gorman's contention fails.

Considering the plain meaning of former PCC 6.07.010(A) and controlling law on the public duty doctrine, I am convinced that the failure to enforce exception does not apply here. Therefore I would reverse and remand with instructions to dismiss the county as a defendant.

_____
Worswick, C.J.