# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JUDITH COX and CHARLES COX individually and as Personal Representatives of the Estates of C.J.P. and B.T.P., | No. 55438-1-II |
| Respondents/Cross-Appellants, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, FOREST JACOBSON, ROCKY STEPHENSON, JANE WILSON, and BILLIE REED-LYYSKI, | UNPUBLISHED OPINION |
| Appellants/Cross-Respondents. | |

VELJACIC, J. — Joshua Powell killed his two sons, C.J.P. and B.T.P., at his rental house in Graham during a social worker supervised visit. The maternal grandparents, Judith and Charles Cox, subsequently sued the Department of Social and Health Services (DSHS[1]) for negligently failing to protect the boys from foreseeable harm.

DSHS filed dependency petitions on behalf of C.J.P. and B.T.P., and the dependency court placed the boys in the custody and control of DSHS while allowing Powell supervised visits. DSHS contracted with Foster Care Resources Network (FCRN) to supervise the visits, and FCRN

---

[1] The agency at issue here is the Department of Children, Youth, and Family (DCYF), formerly Child Protective Services (CPS). DCYF is a subagency of the Department of Social and Health Services (DSHS). Various references throughout the record alternatively refer to defendants as DCYF and DSHS. For consistency, we will refer only to DSHS.

employee Elizabeth Griffin-Hall was selected as the supervisor. DSHS social workers later moved the location of the supervised visits to Powell's rental home.

After C.J.P. and B.T.P. ran inside at the beginning of a visit, Powell slammed the door on Griffin-Hall and locked the door. He then struck the boys multiple times with a hatchet, poured gasoline on them, and ignited a fire. C.J.P. and B.T.P., as well as Powell, died when the house exploded.

After a lengthy trial, the jury found DSHS liable for the boys' deaths and awarded $57.5 million in noneconomic damages to the estates of each boy (later reduced to a total of $98,509,000 after segregation of damages from Powell's intentional conduct). DSHS moved for a remittitur of the jury's damage award and, in the alternative, a new trial. The trial court granted DSHS's motion and reduced the award by two-thirds. The Coxes did not consent to the remittitur and opted for a new trial instead. This appeal was filed before the new trial could be held.

This appeal focuses on two main aspects of the trial court proceedings: the liability verdict and the damages award. As to the liability verdict, DSHS appeals the jury's verdict and the trial court's January 6, 2021 new trial order. First, DSHS argues that the trial court erred in denying its CR 50 motion for a directed verdict as to liability because the February 1, 2012 dependency court orders were a superseding cause to the Coxes' negligent visitation claims. Second, DSHS argues that the trial court erred in giving jury instruction 6, which stated that FCRN and Griffin-Hall were DSHS's agents, and in denying multiple proposed jury instructions. Third, DSHS argues that the trial court abused its discretion in excluding the testimony of the dependency court judge, the testimony of Powell's attorney during the dependency proceedings, the dependency hearing transcripts, and the guardian ad litem's (GAL) report because that evidence was relevant to its

2

superseding cause defense. Fourth, DSHS argues that the trial court abused its discretion in limiting its January 6, 2021 new trial order to damages only.

As to the damages award, the Coxes cross-appeal the trial court's January 6, 2021 order. This order granted a new trial on damages only based on the Coxes' refusal to accept the remitted damages award. The Coxes argue that we should reinstate the jury's damages award in full because (1) it was within the range of substantial evidence in the record and (2) nothing in the record demonstrates that it was the result of passion or prejudice.

With respect to DSHS's appeal of the liability verdict, we hold that the trial court did not err in denying DSHS's CR 50 motion because the dependency court orders were not a superseding cause to the Coxes' negligence claims. We also hold that the trial court did not err in giving jury instruction 6 or abuse its discretion in denying DSHS's proposed jury instructions. We further hold that the trial court did not abuse its discretion in excluding DSHS's proffered testimony because it was irrelevant. Accordingly, we affirm the jury's liability verdict.

However, we hold that the trial court's remittitur order was improper because the jury's damages award was within the range of substantial evidence in the record and that nothing in the record shows it was the result of passion and prejudice. Because we hold that remittitur was improper, we do not address DSHS's new trial arguments. Accordingly, we reverse the trial court's new trial order and reinstate the jury's damages award in full.

FACTS

I.      BACKGROUND—THE EVENTS LEADING UP TO POWELL'S KILLING OF C.J.P. AND B.T.P.

A.      Susan Powell's Disappearance and The "House of Horrors"

In December 2009, Susan Powell disappeared from the Utah home that she shared with her husband, Powell, and their two boys, C.J.P. and B.T.P, when Powell took the family on a winter

3

camping trip. Shortly after Susan's disappearance, Powell moved to his father Stephen Powell's home in Puyallup with the two boys. At all times relevant here, Powell was the only person of interest in Susan's disappearance.

In August 2011, Washington authorities—acting on information from Utah authorities investigating Susan's disappearance—executed a search warrant on Stephen's home. Law enforcement encountered a "house of horrors." 13 Report of Proceedings (RP) (Feb. 27, 2020) at 725. They found a range of disturbing materials throughout the house, such as pornography, graphic sexually violent art work, gallon-size bags of toenail and hair clippings, a paper mâché pterodactyl that was hanging from a noose, and a locked filing cabinet with used tampons, dirty women's underwear, and plastic female body parts used for "self-pleasure." 13 RP (Feb. 27, 2020) at 726. In the course of the search, law enforcement confiscated 15 computers that, when examined, were found to contain depictions of minors engaged in sexually explicit conduct. Law enforcement also discovered numerous videos, 8 millimeter tapes, and disk drives belonging to Stephen which displayed acts of voyeurism on neighborhood girls and other women and girls.

On September 22, 2011, Stephen was arrested on charges of possession of depictions of minors engaged in sexually explicit conduct and voyeurism. That same day, C.J.P. and B.T.P. were placed into protective custody with DSHS. The Child Protective Services (CPS) intake form for C.J.P. and B.T.P. identified Powell as a suspect in the "murder" of his wife, Susan. Ex. 5; 30 RP (July 14, 2020 AM) at 1875.

B.      The Initial Dependency Proceedings and Supervised Visitations

On September 23, 2011, the Coxes filed a nonparental custody petition for C.J.P. and B.T.P. in Pierce County Superior Court. Because the boys were under the protective custody of

DSHS, a hearing was held to determine whether DSHS would file a dependency petition, which would take precedence over the nonparental custody action.

On September 27, 2011, DSHS filed dependency petitions on behalf of C.J.P. and B.T.P. A contested shelter care hearing was held the following day. At this hearing, DSHS informed the court that the overriding concern for the dependency was the disappearance of Susan and that it believed Powell was responsible for her disappearance. Of the multiple concerns addressed to support the dependency, DSHS explained that "[e]verything else . . . would pale . . . in comparison to [Susan's disappearance]." 36 RP (July 23, 2020 PM) at 2565.

On September 28, the dependency court entered two orders. First, the court issued an order of concurrent jurisdiction, which stayed the nonparental custody action pending the resolution of the dependency action. Second, the court issued a shelter care order placing the two boys in the temporary custody and supervision of DSHS, authorizing relative placement with the Coxes. The shelter care order required DSHS to provide supervised visits between Powell and the two boys on Sundays and prohibited Powell from either discussing pending litigation with the boys or making disparaging remarks about the Coxes. The shelter care order did not direct where the supervised visitations were to occur.

DSHS entered into a contract with FCRN to secure a supervisor for the court ordered visits. Griffin-Hall, an employee of FCRN, was selected as the visitation supervisor. Her role was to provide observation of the parent-child interactions and to report those observations to the assigned social worker. The first supervised visit occurred at the FCRN facility on October 2.

On October 26, Powell agreed to the dependency of C.J.P. and B.T.P. Accordingly, the court entered an order of dependency pursuant to RCW 13.34.030(6)(c) for both of the boys. Specifically, the order placed C.J.P. and B.T.P. in the custody, control, and care of DSHS, again

5

authorizing relative placement with the Coxes. The order also required Powell to undergo a parenting assessment and psychological evaluation with Dr. James Manley. Visitations remained supervised by a DSHS approved provider and the GAL on Sundays for a minimum of three hours, but could be expanded upon agreement of the parties. This order did not direct where the supervised visitations were to occur.

In November, DSHS social workers Forest Jacobson and Betsy Rodgers, and GAL Julio Serrano, changed the location of the supervised visits from a DSHS approved facility to Powell's rental house in Graham. At all times relevant here, the social workers and GAL had the discretion to change the visitation location. However, DSHS's policies and practices in place at the time did not permit supervised visits to occur in a noncustodial parent's home.

C.      DSHS Becomes Aware of Powell's Increasing Risk of Harm to the Boys

Shortly after DSHS moved supervised visits to Powell's rental house, more troubling information about Powell began to develop. On November 15, Utah law enforcement notified DSHS that they had found incestuous depictions of minors engaged in sexually explicit conduct on Powell's computer in Utah, which was seized pursuant to a search warrant in 2009. DSHS did not receive these images until later on in the dependency because that evidence was sealed by the Utah courts. A few days later, DSHS also learned that Powell had sexually abused his younger sister; that Powell had molested an unrelated younger girl; that Powell had tortured and killed a family pet and coerced his sister to touch the blood of the dead pet; and that Powell had attempted to commit suicide in the past. DSHS also learned that Powell had once threatened his mother with a knife, and that his mother and sister both expressed fear that he would kill them. This information was obtained from Stephen's divorce materials, which Charles Cox supplied to the DSHS social worker.

6

DSHS was also aware of the boys' strange verbalizations pertaining to Susan's disappearance and instances alluding to violence. For example, in August 2010, C.J.P.'s daycare provider reported overhearing him talk about killing a bear and hiding its remains by digging a hole and placing rocks, trees, and bushes over the top of the corpse. C.J.P. was only 6 years old when he made this comment. C.J.P.'s elementary school also reported disturbing statements that he made pertaining to violence and hate, and other statements disparaging members of the Church of Jesus Christ of Latter-Day Saints; the Coxes are members.

On November 6, 2011, DSHS learned about C.J.P.'s drawing that stated "Don't play with me," which appeared to indicate his negative and violent thoughts. 8 RP (Feb. 19, 2020 AM) at 246. That same day, C.J.P.'s kindergarten teacher expressed their concern about the boys' well-being. DSHS also learned about a drawing that B.T.P. made portraying Susan in the trunk of a car and his associated statement about "not finding Mommy [] until we go camping again." 8 RP (Feb. 19, 2020 AM) at 247.

The boys made other disturbing statements as the dependency progressed. For example, on one occasion GAL Serrano spoke with B.T.P. about how things were going with the Coxes and recalled him responding: "No one better mess with my dad because they'll get killed." 22 RP (Mar. 16, 2020 AM) at 1617. And on November 29, during a supervised visit, the boys' therapist reported that one of the boys made a comment about Susan's body being found in the desert. Griffin-Hall (the FCRN visitation supervisor) reported that Powell became "visibly upset" with this comment and could not regain his composure throughout the rest of the supervised visit. 8 RP (Feb. 19, 2020 AM) at 249.

7

D.     DSHS's Risk Assessment of Powell and Increased Supervised Visitations

Shortly after the September 2011 shelter care hearing, Rocky Stephenson, a CPS investigator, was assigned to investigate Powell and provide a risk assessment for the boys' safety. On November 30, Stephenson closed his investigation concluding that the allegations of Powell's negligence and maltreatment were unfounded.

However, Stephenson closed the investigation before it was complete. Stephenson closed the investigation before January 2012 when DSHS received the incestuous depictions of minors engaged in sexually explicit conduct that were found on Powell's computer in Utah. Additionally, Stephenson concluded his investigation without interviewing collateral sources, such as Powell's other family members, the boys' daycare providers, school personnel, or any of Powell's alleged employment sources. Stephenson also did not further investigate law enforcement's concerns that Powell posed a risk of killing the boys.

In December, DSHS social workers and GAL Serrano agreed to increase visitation from once per week on Sundays to twice per week on Wednesdays and Sundays. At Powell's request, his friend and pastor, Timothy Atkins, became an additional visitation supervisor. However, around the same time, Lori Narigi, the boys' therapist, strongly recommended that the boys should not visit Powell unless a trained DSHS staff member supervised the visits.

E.     Photographs from Utah and Dr. Manley's Psychological Evaluation of Powell

On December 9, Dr. Manley completed Powell's psychological evaluation. Dr. Manley diagnosed Powell with adjustment disorder with anxiety and narcissistic personality disorder. Dr. Manley recommended continued supervised visits.

On January 12, 2012, DSHS learned that over 400 images of incestuous depictions of minors engaged in sexually explicit conduct were found on Powell's computer in Utah. Dr.

Manley provided an addendum to his initial psychological evaluation based on the receipt of those images. In the addendum, Dr. Manley expressed that the images gave rise to a "great concern" about Powell's past, especially given the information supplied by his father Stephen's divorce materials. 33 RP (July 20, 2020 AM) at 2196. Dr. Manley also opined that, given the gaps of information about Powell, he did not believe that Powell could presently be a stable and appropriate resource for the boys. Until Powell could overcome his "defensiveness and openly discuss himself in all areas of his life," he recommended against any change to visitation. 33 RP (July 20, 2020 AM) at 2197. Dr. Manley then referred Powell for a psychosexual evaluation and a polygraph.

F.      The February 1, 2012 First Dependency Review Hearing and Resulting Orders

On February 1, the first dependency review hearing occurred. The court entered an order denying Powell's motion to place the boys with him. Instead, the court ordered that both of the boys remain in the care and custody of DSHS, again authorizing relative placement with the Coxes. The orders also required Powell to undergo a psychosexual evaluation and to follow all of Dr. Manley's recommendations.

Section 3.14 of the February 1 dependency orders also required DSHS to continue providing supervised visitations for Powell: "Two visits each week, three hours each minimum, supervised by DCFS or DCFS approved person. Visits may be expanded upon agreement of the GAL and social worker." Ex. 257 at 7; Ex. 258 at 7. The court did not order a specific visitation location in either of the February 1 dependency orders.

The colloquy between the court and Powell's attorney, (now) Judge Bassett, also demonstrated that only frequency and duration of the visitations was discussed, not location:

9

MR. BASSETT: Your Honor, we would ask for the Court's ruling with respect to the visitation. We would ask the Court to order that it continue twice a week.

MR. LONG: And Your Honor—

THE COURT: That was my understanding of Dr. Manley's amended recommendation, that it remain as it currently is. As I understand, it is twice a week for three—

MR. LONG: Three hours.

THE COURT: Twice a week for three hours supervised.

MR. POWELL: Four. Four.

(Off-the-record discussion.)

MR. LONG: We've had—we've had a—

MR. BASSETT: So just do a minimum of three twice a week. As long as it's a minimum of three twice a week, that's fine. I know Ms. Jacobson—

THE COURT: Okay. Two visits. Minimum of three, twice a week. That should resolve that issue.

Ex. 288 at 32 (unadmitted).

G.    Powell Kills C.J.P. and B.T.P. During a Supervised Visit

On February 2, Atkins, the pastor, withdrew from being a visitation supervisor because of the building criminal case against Powell regarding Susan's disappearance. Atkin's withdrawal meant that Powell lost one of his primary supporters in the dependency proceedings.

On February 3, DSHS learned that Powell was likely going to be arrested in the near future. That same day, Charles Cox, the boys' grandfather called Jacobson, one of the social workers, and warned her that Powell was backed into a corner and expressed his concern about the boys' safety. Jacobson assured Charles that continued visitations would be fine because nothing had happened in the past.

On February 5, at 11:57 AM, Griffin-Hall arrived at Powell's rental house with both of the boys for a regularly scheduled visit. When they arrived, the boys got out of the car and ran ahead to greet Powell.

Powell stood at the door waiting for the boys. Powell then picked the boys up and slammed the door on Griffin-Hall when she was approximately a foot away—close enough that she could

feel the vibration of the door. She then heard Powell triple locking the front door and telling the boys: "Lay facedown. I have a surprise for you." 20 RP (Mar. 11, 2020 AM) at 1421. She then heard B.T.P. cry out as if he were in pain.

Griffin-Hall pounded on the door, pleading with Powell to let her in. She ran to the garage, but began to smell gasoline. She knew something was terribly wrong because Powell normally kept his garage in immaculate shape. Griffin-Hall called her supervisor, who in turn advised her to call 911.

At 12:08 PM, Griffin-Hall called 911 to report the incident and informed the dispatcher that the boys had been in the house for approximately 10 minutes. Shortly thereafter, she saw the house explode and realized it was on fire. At 12:24 PM, she called 911 a second time to report the explosion. First responders arrived at the rental house at 12:29 PM, approximately 21 minutes after the first 911 call.

C.J.P.'s and B.T.P.'s bodies were found burned with multiple hatchet wounds to their upper neck and head areas. Both of the boys died as a result of carbon monoxide (CO) poisoning from the fire. C.J.P. was 7 years old and B.T.P. was 5 years old. Powell also died.

II.    THE COXES' AMENDED COMPLAINT AND THE PROCEEDINGS IN FEDERAL COURT[2]

In November 2014, the Coxes, individually and as personal representatives of the estates of C.J.P. and B.T.P., filed an amended complaint in Pierce County Superior Court seeking damages against DSHS and individual social workers (Forest Jacobson, Rocky Stephenson, Jane Wilson, and Billie Reed-Lyyski) based on the deaths of C.J.P. and B.T.P. The amended complaint alleged

---

[2] Much of the procedural history discussed in this section can be found in the Ninth Circuit opinion, *Cox v. Dep't of Soc. and Health Servs.*, 913 F.3d 831 (9th Cir. 2019).

a 42 U.S.C. § 1983 claim against the individual social workers and negligence claims against DSHS.

DSHS filed a notice of removal to the United States District Court for the Western District of Washington. DSHS and the social workers moved for summary judgment, which the federal district court granted. *See Cox v. Dep't of Soc. and Health Servs.,* 913 F.3d 831, 836 (9th Cir. 2019) (discussing district court opinion). As to the social workers, the district court concluded that they had absolute immunity or, alternatively, qualified immunity from the Coxes' § 1983 claims. *See Cox*, 913 F.3d at 836. As to DSHS, the district court concluded that the dependency court's February 1 orders were a superseding cause that severed DSHS's liability for the deaths and that DSHS did not negligently facilitate the visit. *Cox*, 913 F.3d at 836.

On appeal, the Ninth Circuit affirmed the district court's dismissal of the § 1983 claims against the social workers. *Cox*, 913 F.3d at 838. The Ninth Circuit reversed the district court's negligence holdings regarding DSHS because genuine issues of material fact remained as to whether DSHS used reasonable care to avoid placing the boys in harm's way, including: (1) determining Powell's visitation location; (2) facilitating the February 5, 2012 visitation; and (3) training its social workers to conduct visitations. *Cox*, 913 F.3d at 841-42. The Ninth Circuit also concluded that material issues of fact remained as to whether DSHS's actions proximately caused the boys to be placed in harm's way. *Cox*, 913 F.3d at 842-43. Accordingly, the Ninth Circuit remanded the negligence claims against DSHS to the district court, "express[ing] no opinion as to the merits of those reinstated claims." *Cox*, 913 F.3d at 843.

In May 2019, the district court remanded the state law negligence claims to Pierce County Superior Court.

III.    PRE-TRIAL PROCEEDINGS

   A.    The Dependency Court Judge's Testimony

Before trial, the Coxes moved to exclude the dependency court judge's testimony as to whether she reviewed particular materials submitted by DSHS during the dependency proceedings because such testimony was not relevant, and even if it were, it should be excluded under ER 403.

DSHS objected to the exclusion of the dependency court judge's testimony. DSHS argued that the judge's testimony was relevant because the Coxes claimed that DSHS failed to keep the dependency court apprised of certain material facts, including but not limited to: (1) Powell's repeated violations of the dependency orders; (2) that visitations were moved to Powell's rental house; and (3) the boys' therapist's concerns about Powell's behavior during therapy.

The trial court excluded the dependency court judge's testimony because, given the lapse of time, whether she would have changed her orders had she received additional evidence would be speculative. The court permitted the admission of the file record if those records were certified public records, but reserved ruling on each exhibit on an item-by-item basis.

   B.    Judge Bassett's Testimony

The Coxes also sought to exclude Judge Bassett (Powell's attorney during the dependency proceedings) from testifying about his 2012 opinion of Powell's low risk of harm to the boys because such testimony is irrelevant. Notably, there is no record of Judge Bassett's opinion in 2012.

DSHS responded that Judge Bassett's testimony would be relevant. It surmised that Judge Bassett would testify about the information he supplied to the court during the dependency proceedings and to his opinion of low risk regarding Powell's murder-suicide, which addresses the issue of foreseeability. Again, there is no record of Judge Bassett's opinion in 2012.

The trial court granted the Coxes' motion. The trial court excluded Judge Bassett's testimony because of his current role as a sitting superior court judge and because his testimony would be cumulative.

C.    Powell as an Intentional Tortfeasor

The Coxes and DSHS stipulated that Powell was an intentional tortfeasor for the purposes of segregating damages from DSHS's alleged negligence, if any. The trial court accepted this stipulation.

IV.    RELEVANT PORTIONS OF THE TRIAL[3]

The witnesses in this negligence trial testified consistently with the facts set forth above in section I. Set forth below are portions of the trial pertaining to the noneconomic damages suffered by C.J.P. and B.T.P., and DSHS's CR 50 motion for a directed verdict based on superseding cause.[4]

A.    Evidence on C.J.P.'s and B.T.P.'s Conscious Pain and Suffering

The Coxes called two witnesses to testify about the conscious pain and suffering that C.J.P. and B.T.P. endured at the hands of Powell: Dr. Cyril Wecht and Dr. Richard Adler.

Dr. Wecht, a forensic pathologist, testified about the sequence and cause of the boys' deaths, and their ability to perceive conscious pain and suffering. Dr. Wecht testified that Powell first struck both of the boys with a hatchet multiple times. In C.J.P.'s case, Powell struck him in the back of the neck five times. Each of those five chop wounds measured between 2.25 to 3.25 inches by 2 inches in size. One of the strikes transected a portion of C.J.P.'s spinal cord at C6,

---

[3] On March 17, 2020, the trial went into recess due to the COVID-19 global pandemic. After a four-month recess, the trial resumed on July 13, 2020.

[4] DSHS also made several motions seeking to admit testimony of the dependency court judge, Judge Bassett (Powell's then attorney in the dependency proceeding), transcripts of the dependency proceedings, and a GAL report. Based on our ruling below, these facts are unnecessary for delivery of this opinion.

which rendered him paralyzed from the upper chest down. However, C.J.P. remained conscious after the strike to C6 and retained the ability to breathe, swallow, see, smell, and taste.

In B.T.P.'s case, Powell struck him with a hatchet multiple times in the head and upper neck area, but Dr. Wecht was unclear as to precise number of strikes B.T.P. suffered. B.T.P. suffered two prominent skull injuries from the hatchet strikes: (1) a 6-inch by 4-inch fracture to the left side of his head, which became enlarged due to postmortem thermal damage, and (2) a complex fracture that largely obliterated the back of his skull, leaving a large section of his brain missing. One of Powell's hatchet strikes also "fractured" a portion of B.T.P.'s upper neck at C4 and even left a small sliver of metal behind. 10 RP (Feb. 24, 2020 PM) at 1016. B.T.P. remained conscious with these injuries.

Dr. Wecht testified that Powell then doused both of the boys with gasoline and, at some point, started a fire. The autopsy reports showed the presence of alcohol in C.J.P.'s vitreous humor (the fluid behind the eye) and in B.T.P.'s urine. Dr. Wecht testified that alcohol is a byproduct of gasoline when it begins to break down in a fire. The presence of alcohol in both of the boys suggested that they swallowed some of the gasoline that was poured on them. Dr. Wecht also testified that the presence of alcohol in both of the boys clearly indicated that they were alive and conscious during the event because one does not have the ability to swallow when rendered unconscious.

Dr. Wecht testified that, as fire began to develop, the boys began to breathe in the contaminated air, which contained carbon monoxide (CO). The autopsy reports showed that C.J.P. had a CO level of 46 percent and that B.T.P. had a CO level of 51 percent at the time of their deaths—both of which are fatal levels. Dr. Wecht testified that the CO levels meant that both of

the boys were breathing in contaminated air until they died. Thus, Dr. Wecht concluded with reasonable medical certainty that C.J.P. and B.T.P. died as a result of CO poisoning from the fire.

Dr. Wecht further testified that both of the boys' Reticular Activating Systems (RAS) were intact at the time of their death. The RAS is located in the brainstem and transmits physical perceptions, such as pain and suffering. The RAS also controls consciousness. Those physical perceptions are then further transmitted into the frontal lobe of the brain, which controls emotion and intellectual feelings. Thus, Dr. Wecht testified that, because both of the boys' RAS were still intact at the time of their death that indicated to him that they were able to perceive conscious pain and suffering—both physically and emotionally.

Dr. Wecht testified that both of the boys would have begun losing consciousness when their CO levels reached 30-40 percent. Once an individual reaches a deep state of unconsciousness, they would not be able to perceive pain and suffering. Dr. Wecht concluded that the boys experienced conscious pain and suffering from 1 minute up to 8 or 9 minutes before losing consciousness to CO poisoning—beginning at the time Powell slammed the front door on Griffin-Hall.

Dr. Richard Adler, a forensic and clinical psychiatrist, provided testimony about the physical and emotional component of the boys' pain and suffering. He testified about the unimaginable physical pain and suffering that the boys felt breathing in hot, toxic soot from the fire and with gasoline on their chop wounds. Dr. Adler stated that he worked with child burn victims and, even then, could not think of "any worse circumstances" than what occurred here. 11 RP (Feb. 25, 2020 AM) at 511. He also testified about the abject fear, confusion, and betrayal the boys felt as they witnessed their own father mortally attack them and witness the same pain inflicted upon their sibling. Dr. Adler testified that even given his line of work, he had "never

16

encountered such an abject, sadistic, horrific, terrorizing experience" that the boys must have endured—it was "almost beyond human comprehension." 11 RP (Feb. 24, 2020 AM) at 509. Dr. Adler further testified that the boys were predisposed to emotional harm based on Susan's disappearance and their sudden move to Washington which, in turn, likely heightened the conscious pain and suffering they endured.

B.      CR 50 Motion for a Directed Verdict Based on Superseding Cause

After the close of evidence, DSHS filed a motion for a directed verdict under CR 50. DSHS argued that the February 1, 2012 dependency orders were a superseding cause to the Coxes' negligence claims because the court was given all material information but still ruled that visitation shall "remain as it currently is," which included the visitation location. Clerk's Papers (CP) at 7899.

At a hearing on the CR 50 motion, DSHS contended that the dependency court was aware that visitations were occurring in Powell's rental house based on Serrano's GAL report, attorney Bassett's statements from dependency hearings, and Dr. Manley's December 2011 report. The trial court then inquired if there was anything in the dependency court's order that specified whether "supervised visitation must take place in [] Powell's home or that in any way circumscribes [DSHS's] discretion in determining where and how often those visitations [would] take place." 38 RP (July 28, 2020 PM) at 2737. DSHS conceded that none of the orders ever identified a specific visitation location. The trial court then denied DSHS's CR 50 motion.

17

V.      JURY INSTRUCTIONS AND PROPOSED SPECIAL VERDICT FORMS

      A.      Jury Instruction 6 and DSHS's Proposed Supplemental Instructions 41-43—Agency

The Coxes proposed jury instruction 6 which provided in relevant part that, "[FCRN] (and its employees, including [] Griffin-Hall) was the agent of the State of Washington, and, therefore, any act or omission of the agent was the act or omission of the State of Washington." CP at 6396.

DSHS objected to the Coxes' proposed instruction 6 contending that it erroneously imposed an agency relationship as a matter of law and amounted to an improper comment on the evidence by the trial court in violation of article IV, section 16, of the Washington Constitution. DSHS instead proposed supplemental jury instructions 41, 42, and 43 because it contended that the issue of agency was a disputed question of fact for the jury to resolve. DSHS's proposed supplemental jury instruction 41 provided that,

> [DSHS] is sued as the principal and the plaintiffs' claim that [] Griffin-Hall was acting as an agent. [DSHS] denies that [] Griffin-Hall was acting as an agent but admits that she was acting within the scope of authority under a contract.
> If you find that [] Griffin-Hall was the agent of [DSHS] [and that she] was acting within the scope of authority, then any act or omission of agent's [] Griffin-Hall was the act or omission of [DSHS].
> If you do not find that [] Griffin-Hall was acting as the agent of [DSHS], then [DSHS] is not liable.

CP at 7411. DSHS's proposed supplemental jury instruction 42 provided that,

> An agent is a person employed under an express or implied agreement to perform services for another, called the principal, and who is subject to the principal's control or right to control the manner and means of performing the services. The agency agreement may be oral or in writing.

CP at 7412. DSHS's proposed supplemental jury instruction 43 provided that,

> An independent contractor is a person who undertakes to perform work for another but who is not subject to that other person's control of, or right to control, the manner or means of performing the work.
> One who engages an independent contractor is not liable to others for the negligence of the independent contractor.

18

CP at 7413.

The trial court rejected DSHS's proposed instructions 41-43 and the special verdict form. Instead, in instruction 6, the trial court instructed that FCRN and Griffin-Hall were agents of DSHS as a matter of law: "[FCRN] (and its employees, including [] Griffin-Hall) was the agent of the State of Washington, and, therefore, any act or omission of the agent, including its employees, was the act or omission of the State of Washington." CP at 8131.

B.    DSHS's Proposed Jury Instruction 24 and Proposed Supplemental Instruction 15—Superseding Cause

DSHS proposed jury instruction and supplemental instruction 15, which set forth its superseding cause defense. Proposed supplemental jury instruction 15 provided that,

> If you find the dependency and family court was aware of all material facts and information regarding [] Powell at the time of the court ordered visitation on February 1, 2012,[then] you cannot base any liability on [] the visitation occurring in [] Powell's home, [and] your verdict should be for [DSHS]. A material fact is one that would have changed the court's decision.

CP at 7894. The trial court denied supplemental jury instruction 15 reasoning that "There's no way of knowing what would have changed the Court's decision. That's entire speculation." 38 RP (July 28, 2020 PM) at 2793.

Proposed jury instruction 24[5] provided that,

> In order to establish proximate cause based on [DSHS's] alleged failure to provide the court with new information objectively establishing that [] Powell posed an imminent risk of serious harm to his children, Plaintiffs must prove by a preponderance of the evidence that if [DSHS] had notified the court of this new information, the court would have modified its order and limited or denied parental visitation based on the new information.

---

[5] DSHS mistakenly numbered this as proposed instruction 23.

CP at 7346. The trial court denied proposed instruction 24 because "there's no way that the [Coxes] could prove that if the Court had additional information they would have modified or changed their order one way or another. That sets up an impossible standard, and I don't think that is the law." 38 RP (July 28, 2020 PM) at 2773.

      C.      DSHS's Proposed Jury Instruction 26—Duty to Comply with Court Order

DSHS proposed jury instruction 26, which explained that DSHS had a duty to comply with the dependency court orders and could only change or limit Powell's visitation rights if there was evidence that he posed an imminent and serious risk of harm to the boys. Instruction 26 provided that,

> In a situation where a court has ordered supervised parental visitation, [DSHS] has a duty to comply with that order.
> In order for [DSHS] to change court ordered parental visitation, it must have articulable facts objectively establishing that the parent posed an imminent and serious risk of harm to the child if the court ordered visitation is allowed to proceed, and must request the court to modify its order, unless there is insufficient time.
> This factual information must be information the court was not aware of at the time it ordered continued visitation.

CP at 7348.

The trial court denied instruction 26 because the dependency court "never ordered a specific location" for the supervised visitations in the February 1 orders and because the evidence showed that DSHS had the discretion to determine the location. 38 RP (July 28, 2020 PM) at 2774.

      D.      DSHS's Proposed Jury Instruction 27—Denial or Limitation of Parental Visitations

DSHS proposed jury instruction 27, which explained that parents have a right to visitation with their children and could only be limited or denied if the parent poses an actual risk of harm to the child. Proposed instruction 27 provided that,

> A statute provides visitation is the right of the family, including the child and parent, in cases in which visitation is in the best interest of the child. Early, consistent, and frequent visitation is crucial for maintaining parent-child

20

relationships in making it possible for parents and children to safety reunify. [DSHS] shall encourage the maximum parent and child and sibling contact possible, when it is in the best interest of the child, including visitation and participation by the parents in the care of the child while the child is in placement.

Visitation shall not be limited as a sanction for a parent's failure to comply with court orders or services where the health, safety, or welfare of the child is not at risk as a result of the visitation.

Visitation may be limited or denied only if a court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare.

CP at 7349.

The trial court denied proposed instruction 27. The court appeared to reason that it did not fairly characterize the law and because the Coxes did not present evidence that visitations should have been denied or limited—rather, they argued that DSHS should have changed the location of the supervised visitations.

> E.      DSHS's Proposed Special Verdict Form

DSHS also proposed a special verdict form that incorporated questions consistent with proposed instruction 24, proposed supplemental instruction 15, 41, 42, and 43, and proposed instructions 26 and 27. The court declined to give this special verdict form.

> F.      DSHS's Proposed Supplemental Jury Instruction 40—Lawyer Permitted to Disclose Client Information to Prevent Substantial Bodily Harm

DSHS proposed supplemental instruction 40, which explained attorney Bassett's duty to disclose information to prevent a client from committing substantial bodily harm or a crime under RPC 1.6. Proposed supplemental instruction 40 provided that,

Under the rules of professional conduct for lawyers, a lawyer to the extent the lawyer reasonably believes necessary:
(1) shall reveal information relating to the representation of a client to prevent reasonably certain death or substantial bodily harm;
(2) may reveal information relating to the representation of a client to prevent the client from committing a crime.
[] Bassett, [] Powell's lawyer in the dependency case, did not reveal any information relating to his representation of [] Powell to prevent reasonably certain death or substantial bodily harm, or to prevent [] Powell from committing a crime.

21

CP at 7410. The trial court denied proposed supplemental instruction 40 because there was no evidence that the GAL or any of the social workers relied on the silence of attorney Bassett in their actions or omissions during the dependency.

## VI.    CLOSING ARGUMENTS

At trial, counsel for the Coxes suggested that $5 million for every minute of conscious pain and suffering would be a reasonable benchmark to compensate each estate for their noneconomic damages. However, DSHS provided no argument to the contrary to guide the jury's damage determination.

## VII.    VERDICT AND POST-TRIAL MOTIONS

On July 31, 2020, the jury returned a verdict in favor of the Coxes finding DSHS negligent and that such negligence was a proximate cause of C.J.P.'s and B.T.P.'s deaths. The jury awarded C.J.P.'s and B.T.P.'s estates $57.5 million each in noneconomic damages (for a total of $115 million). The jury found that Powell's intentional criminal acts proximately caused $8,245,500 to each of C.J.P.'s and B.T.P.'s estates (for a total of $16,490,000) in noneconomic damages, which was segregated.

On August 17, the trial court entered judgment against DSHS in the amount of $49,254,500 for each of the boys' estates. Thus, a total judgment of $98,509,000 was entered against DSHS.

On August 27, DSHS filed a motion for a new trial under CR 59 and, in the alternative, an order of remittitur pursuant to RCW 4.76.030. It argued that the noneconomic damages awarded were so excessive that it was outside the range of substantial evidence in the record and was the result of passion or prejudice.

On September 15, the trial court granted DSHS's motion for a remittitur and reduced the damages award by two-thirds. The trial court permitted the Coxes to reject the remittitur and accept a new trial as an alternative.

On October 8, the trial court issued an order finding

> that the damages awarded were unmistakably far removed from the range that would be supportable based on substantial evidence in the record. Further, the damages awarded were so flagrantly excessive as to shock the conscience of the Court, and most certainly were driven by the passion or prejudice on the part of the triers of fact.

CP at 9172. Accordingly, the court vacated the judgment entered on August 17 and remitted the damages award to each estate by two-thirds—to an amount of $16,418,166 per estate.[6] The order also provided that, in the event the Coxes elect not to accept the remittitur, DSHS's motion for a new trial would be granted.

The Coxes declined to accept the remittitur. At a hearing, DSHS argued that it was entitled to a retrial on both liability and damages. The Coxes argued the court's remittitur provided a basis for a new trial on damages only. The trial court requested briefing on whether, if remittitur is rejected, the new trial should be limited to damages only.

On January 6, 2021, the trial court entered an order granting DSHS's motion for a new trial pursuant to RCW 4.76.030—if the Coxes rejected the remittitur, then the new trial would be limited to the issue of damages only.

DSHS appeals the jury's liability verdict and trial court's order granting a new trial on damages only. The Coxes cross-appeal the trial court's order remitting the jury's award or ordering a new damages trial.

---

[6] The trial court initially entered an order on October 1which remitted the damages to $16,488,166 per estate. The October 8 order simply corrects the court's remittitur calculation.

ANALYSIS

DSHS'S APPEAL

I.   SUPERSEDING CAUSE

DSHS argues that the trial court erred in denying its CR 50 motion because the February 1 dependency orders constituted a superseding cause that cut off its liability for the Coxes' negligence claims.  More specifically, DSHS contends that the February 1 dependency orders were a superseding cause for the negligence claims because the dependency court was aware of all material information—i.e. that supervised visitations were occurring at Powell's rental house— but still ordered visitation "to remain as it currently is," which includes visitation location.  Br. of Appellant at 74; *see also* Br. of Appellant at 70 n.25.  We disagree.

A.   Standard of Review

"We review a trial court's decision on a CR 50 motion as a matter of law and 'apply the same standard as the trial court.'"  *Mancini v. City of Tacoma*, 196 Wn.2d 864, 877, 479 P.3d 656 (2021) (quoting *Schmidt v. Coogan*, 162 Wn.2d 488, 491, 173 P.3d 273 (2007)).  We may affirm the trial court's decision on any ground supported by the record.  *Washburn v. City of Federal Way*, 178 Wn.2d 732, 753 n.9, 310 P.3d 1275 (2013).

"Courts are appropriately hesitant to take cases away from juries."  *H.B.H. v. State*, 192 Wn.2d 154, 162, 429 P.3d 484 (2018).  "A motion for directed verdict 'should be granted only when, after viewing the evidence in the light most favorable to the nonmoving party, there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party.'"  *Mancini*, 196 Wn.2d at 877 (quoting *H.B.H.*, 192 Wn.2d at 162).  "'Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared

premise.'" *Id*. (internal quotation marks omitted) (quoting *Delgado Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 915, 32 P.3d 250 (2001)).

B.     Legal Principles

"A cause of action for negligence requires the plaintiff to show (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, (3) an injury, and (4) a proximate cause between the breach and the injury." *Travis v. Bohannon*, 128 Wn. App. 231, 237, 115 P.3d 342 (2005).

"Proximate cause includes two elements: cause in fact and legal cause." *Petcu v. State*, 121 Wn. App. 36, 56, 86 P.3d 1234 (2004). Cause in fact is a jury question, established by showing that "'but for'" the defendant's actions, the plaintiff would not have been injured. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 82, 1 P.3d 1148 (2000) (quoting *Schooley v. Pinch's Deli Market, Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998)). "Legal cause involves the determination, in view of 'logic, common sense, justice, policy, and precedent,' of the extent to which a defendant should remain legally responsible for the harmful consequences of his acts [or omissions]." *Petcu*, 121 Wn. App. at 56 (internal quotation marks omitted) (quoting *Minahan v. West. Wash. Fair Assoc.*, 117 Wn. App. 881, 888, 73 P.3d 1019 (2003)).

A defendant's negligence is the proximate cause of the plaintiff's injury only if such negligence, unbroken by any new independent cause, produces the injury complained of. *Bishop v. Miche*, 137 Wn.2d 518, 532, 973 P.2d 465 (1999). "If a new, independent act breaks the chain of causation, the original negligence is no longer a proximate cause of the injury and the defendant is not liable for the injury." *Travis*, 128 Wn. App. at 241. Courts referred to this as the doctrine of superseding cause. *Schooley*, 134 Wn.2d at 482.

"A court order will act as a superseding cause that cuts off liability 'only if all material information has been presented to the court.'" *McCarthy v. Clark County*, 193 Wn. App. 314,

329-30, 376 P.3d 1127 (2016) (addressing negligent investigation) (quoting *Tyner*, 141 Wn.2d at 88). "A material fact is one that would have changed the outcome of the court's decision." *Petcu*, 121 Wn. App. at 56. "Materiality is a question of fact unless reasonable minds could only reach one conclusion." *McCarthy*, 193 Wn. App. at 330.

In simplest terms, for DSHS to prevail on its CR 50 motion, it must show that, viewing the evidence in the light most favorable to the Coxes, the court orders required or prohibited conduct that caused an injury. Without causation, the Coxes would fail in a necessary element of their negligence cause of action. DSHS fails to make this showing.

C.      The Trial Court Did Not Err in Denying DSHS's CR 50 Motion

Here, viewing the evidence in the light most favorable to the Coxes, the February 1 dependency orders were not a superseding cause that cut off DSHS's liability for the negligent visitation claims because the orders did not produce the injury complained of. Contrary to DSHS's contention, nowhere in the February 1 dependency orders did the court direct that supervised visitations *must* occur at Powell's rental house. Rather, the only conditions of supervised visitation that the court imposed related to frequency and duration. Because there is no order circumscribing DSHS's discretion to change visitation location, we conclude that the February 1 dependency orders were not a cause in fact and could not therefore be a superseding cause of the injury to the boys.

DSHS appears to argue the February 1 dependency orders were a superseding cause for the negligence claims because the court was aware that supervised visits were occurring at Powell's rental house, but still ordered visitation to "remain as it currently was." Br. of Appellant at 74. DSHS's argument assumes that the court addressed visitation location in those orders. We disagree.

Here, DSHS misplaces its extensive reliance on the court's oral ruling that visitation should "remain as it currently is." Washington is a written order state. *State v. Molina*, 16 Wn. App. 2d 908, 922, 485 P.3d 963, *review denied*, 198 Wn.2d 1008 (2021). The written order is controlling and the trial court's oral statements are no more than a verbal expression of its informal opinion at the time. *Id*. Because the written February 1 dependency orders, on their face, did not direct a specific visitation location, we conclude that those orders are not a superseding cause to the Coxes' negligent visitation claims.

But also, DSHS's reliance on the court's oral ruling fails because the record demonstrates that the phrase "remain as it currently is" refers only to frequency and location—not visitation location, as again, location was never ordered by the court. The subject oral order can be found in the transcript from the February 1 dependency review hearing. There, attorney Bassett engaged in a brief colloquy with the court to clarify the order as it relates to supervised visits. The court ruled that visitations would "remain as it currently is"—addressing only frequency and duration. Ex. 288 at 32 (unadmitted). Thus, we conclude that DSHS's argument fails in any event because the court never addressed the location of the supervised visits during the hearing.

DSHS also argues that, in order to show that the February 1 dependency court orders were not a superseding cause to the negligent visitation claims, the Coxes needed to first show that there was material information that the court was unaware of. DSHS appears to rely on *Tyner*, 141 Wn.2d 68, and *Bishop*, 137 Wn.2d 518, to support its materiality argument. We disagree.

It is not the Coxes' burden to disprove DSHS's defense of superseding cause, rather it is DSHS's burden to first prove the existence of its own defense. Even so, *Tyner* and *Bishop* both address situations where a court order was a potential superseding cause of the injury complained of. In these cases, the crucial issue involved discovering the information provided or withheld by

27

agencies, and whether that information was material to the resulting order, which in turn related to causation of the injury by the agencies conduct or omissions. *Tyner* and *Bishop* are inapposite here. The degree to which information was provided or withheld by DSHS, such that it influenced the court orders, is immaterial because the February 1 court orders did not prohibit or require conduct, i.e. the location of visits, that caused the injury to the boys. Thus, under no circumstance did the Coxes bear the burden to show that there was material information that the court was unaware of. This argument fails.

Next, DSHS contends that the Coxes needed to show facts alleging that Powell posed an actual and imminent risk of harm to C.J.P and B.T.P. because, under RCW 13.34.136(2)(b)(ii), such a showing is necessary to change or limit the location of the ongoing parent-child visitations. In essence, DSHS claims it had no discretion to change the visitation location given the cited statute. We disagree.

DSHS's actual risk of harm argument based on RCW 13.34.136 is misplaced for two reasons. First, RCW 13.34.136(2)(b)(ii) is inapplicable under these circumstances because that statute addresses the permanency plan of care. But there was no permanency plan in place in this case. Second, RCW 13.34.136(2)(b)(ii) is inapplicable on its face because the Coxes never claimed that visitations should have been limited or denied—they only claimed DSHS was negligent in the *manner* in which visitations were carried out, such as permitting visitations to occur at Powell's rental house in contravention of its own established policies and practice.

But DSHS's contention fails for an additional reason. Viewing the evidence in the light most favorable to the Coxes, DSHS's own employees thought they had such discretion to change visitation location. Indeed, Rodgers and Jacobson (the assigned social workers in the case) testified that DSHS and the GAL had the discretion to change visitation location. And in fact,

DSHS *had* changed the visitation location without seeking authority from the court when it moved visits to Powell's rental home in the first instance. Accordingly, this argument fails.

DSHS also briefly contends, without authority, that "[t]he only other way the visitations could have been moved out of [] Powell's [rental] home would have been with his consent." Br. of Appellant at 75 n.29. "Appellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis." *Cook v. Brateng*, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010). Because DSHS fails to support its contention with citations to authority or meaningful analysis, we need not consider this argument.

DSHS next appears to argue that the trial court's ruling on its CR 50 motion is inconsistent with the Ninth Circuit's opinion, which remanded the negligence claims to permit the factfinder to determine whether all material information had been disclosed to the dependency court. But the Ninth Circuit expressed no opinion on whether the *written* dependency orders directed a specific location—it only appeared to address the court's *oral* ruling that visitation should "remain as it currently is" and the materiality standard for when a court order constitutes a superseding cause. *Cox*, 913 F.3d at 842-43. As explained above, the written orders did not produce the injury complained of, so we need not address materiality. Therefore, the trial court's ruling denying DSHS's CR 50 motion is not inconsistent with the Ninth Circuit's opinion in *Cox*, 913 F.3d 831. But even if it was inconsistent with the Ninth Circuit's opinion, DSHS does not provide any authority for why the trial court should have ruled "consistently" with the Ninth Circuit's opinion on this issue. This argument fails.

In sum, because the February 1 dependency orders did not direct that visitations must occur at Powell's rental house, those orders were not a superseding cause that cut off DSHS's liability

for the Coxes' negligent visitation claims. Accordingly, we hold that the trial court did not err in denying DSHS's CR 50 motion for a directed verdict.

D.      Proposed Instruction 24 and Proposed Supplemental Instruction 15

DSHS argues that the trial court abused its discretion in denying proposed instruction 24 and proposed supplemental instruction 15 because the absence of those instructions deprived it the ability to argue that the February 1 dependency orders were a superseding cause to the Coxes' negligent visitation claims. More specifically, DSHS contends that the denial of these proposed instructions prejudiced its defense because

> in their absence, the jury was left to believe that [DSHS] could have unilaterally ignored the [dependency] court's decision for visitation to 'remain as it currently is,' *which included the visits being in [] Powell's home*, and could have prohibited [] Powell from seeing his child *in his home* in the absence of proof (as opposed to speculation) that [] Powell posed a risk of harm.

Br. of Appellant at 68 (emphasis added). We disagree.

Whether to give a specific instruction is within the discretion of the trial court, therefore, we review such decisions for an abuse of discretion. *Taylor v. Intuitive Surgical, Inc.*, 187 Wn.2d 743, 767, 389 P.3d 517 (2017). A trial court abuses its discretion when its ruling is "'manifestly unreasonable or based on untenable grounds.'" *Bengtsson v. Sunnyworld Int'l, Inc.*, 14 Wn. App. 2d 91, 99, 469 P.3d 339 (2020) (internal quotation marks omitted) (quoting *Veit v. Burlington N. Santa Fe Corp.*, 171 Wn.2d 88, 99, 249 P.3d 607 (2011). "Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and when read as a whole, properly inform the trier of fact of the applicable law." *Fergen v. Sestero*, 182 Wn.2d 794, 803, 346 P.3d 708 (2015). The facts of the case govern the propriety of a jury instruction. *Id.* The trial court is under no obligation to give a misleading instruction. *Jaeger v. Cleaver Constr., Inc.*, 148 Wn. App. 698, 716, 201 P.3d 1028 (2009). Likewise, a trial court is not

required to give a proposed instruction if the instruction does not properly state the law or the evidence does not support it. *State v. Ager*, 128 Wn.2d 85, 93, 904 P.2d 715 (1995).

Proposed jury instruction 24 provided that,

In order to establish proximate cause based on [DSHS's] alleged failure to provide the court with new information objectively establishing that [] Powell posed an imminent risk of serious harm to his children, Plaintiffs must prove by a preponderance of the evidence that if [DSHS] had notified the court of this new information, the court would have modified its order and limited or denied parental visitation based on the new information.

CP at 7346. Proposed supplemental jury instruction 15 provided that,

If you find the dependency and family court was aware of all material facts and information regarding [] Powell at the time of the court ordered visitation on February 1, 2012, you cannot base any liability on the location of the visitation occurring in [] Powell's home, your verdict should be for [DSHS]. A material fact is one that would have changed the court's decision.

CP at 7894.

Here, as explained above, the February 1 dependency orders did not direct that visitations must occur in Powell's rental house or any other location—just that they be supervised. Additionally, the evidence at trial demonstrated that DSHS had the discretion to choose visitation location. Because proposed instruction 24 and proposed supplemental instruction 15 are not supported by the evidence and are otherwise misleading, we hold that the trial court did not abuse its discretion in denying those proposed instructions. Accordingly, this argument fails.

E.     Proposed Instruction 26—Duty to Comply with Court Order

DSHS argues that the trial court abused its discretion in denying proposed instruction 26 because the absence of this instruction prejudiced its ability to argue superseding cause to the jury. More specifically, DSHS argues that, without proposed instruction 26, it was unable to argue to the jury that "[s]ince there was no evidence that [] Powell posed an actual risk of harm to his

31

children, [DSHS] could not have changed the location of the visitation in violation of the court's ruling." Br. of Appellant at 63. We disagree.

DSHS's proposed instruction 26 provided that,

In a situation where a court has ordered supervised parental visitation, [DSHS] has a duty to comply with that order.

In order for [DSHS] to change court ordered parental visitation, it must have articulable facts objectively establishing that the parent posed an imminent and serious risk of harm to the child if the court ordered visitation is allowed to proceed, and must request the court to modify its order, unless there is insufficient time.

This factual information must be information the court was not aware of at the time it ordered continued visitation.

CP at 7348.

Here, the trial court did not abuse its discretion in denying proposed instruction 26 because it is not supported by the evidence. As explained above, the February 1 dependency orders did not require supervised visitations to occur at Powell's rental house. And contrary to DSHS's contention, the evidence at trial demonstrated that DSHS *did* have the discretion to choose visitation location.

DSHS appears to contend that the trial court abused its discretion in denying proposed instruction 26 because it failed to give effect to the dependency court's oral ruling that visitation should "remain as it currently is," which encompasses visitation location. As explained above, Washington is a written order state. *Molina*, 16 Wn. App. 2d at 922. The written order is controlling and the trial court's oral statements are no more than a verbal expression of its informal opinion at the time. *Id.* Here, the written dependency orders did not direct a visitation location. In any event, the colloquy between the court and Powell's attorney, (now) Judge Bassett, clearly demonstrated that only the frequency and duration of the supervised visits were addressed, as explained above. Thus, changing the visitation location would not have violated any court order. Accordingly, there is no evidence to support proposed instruction 26.

F.      Proposed Instruction 27—DSHS's ability to limit or deny visitation

DSHS argues that, even though the jury was instructed on the parent's constitutional right to visitation (jury instruction 14),[7] the trial court abused its discretion in denying proposed instruction 27 because that instruction would have explained to the jury that DSHS and the dependency court could not deny or limit visitation unless Powell posed an *actual* risk of harm to the boys—rather than a *foreseeable* risk of harm.  DSHS again appears to argue that proposed instruction 27 was necessary to explain to the jury that, absent evidence of an actual risk of harm to the boys, it was powerless to change the supervised visitation location.  We disagree.

Proposed instruction 27 provides that,

> A statute provides visitation is the right of the family, including the child and parent, in cases in which visitation is in the best interest of the child.  Early, consistent, and frequent visitation is crucial for maintaining parent-child relationships in making it possible for parents and children to safety reunify.  [DSHS] shall encourage the maximum parent and child and sibling contact possible, when it is in the best interest of the child, including visitation and participation by the parents in the care of the child while the child is in placement.
>
> Visitation shall not be limited as a sanction for a parent's failure to comply with court orders or services where the health, safety, or welfare of the child is not at risk as a result of the visitation.
>
> *Visitation may be limited or denied only if a court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare.*

CP at 7349 (emphasis added).  This proposed instruction mirrors RCW 13.34.136(2)(b)(ii).

"Visitation is crucial to the reunification of families and the legislature has recognized its importance in RCW 13.34.136(2)(b)(ii)."  *In re Dep. of Tyler L.*, 150 Wn. App. 800, 804, 208 P.3d 1287 (2009).  In relevant part, that statute provides that,

> (ii)(A) Visitation is the right of the family, including the child and the parent, in cases in which visitation is in the best interest of the child.  Early,

---

[7] Instruction 14 provides that "[a] parent's right to raise their child is a fundamental right protected by the United States Constitution.  The right to parent one's child is protected by both the due process requirements of the Fourteenth Amendment to the United States Constitution and by article I, section 3 of the Washington Constitution."  CP at 8139.

consistent, and frequent visitation is crucial for maintaining parent-child relationships and making it possible for parents and children to safely reunify. The department shall encourage the maximum parent and child and sibling contact possible, when it is in the best interest of the child, including regular visitation and participation by the parents in the care of the child while the child is in placement.

(B) Visitation shall not be limited as a sanction for a parent's failure to comply with court orders or services where the health, safety, or welfare of the child is not at risk as a result of the visitation.

(C) *Visitation may be limited or denied only if the court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare.*

RCW 13.34.136(2)(b)(ii).[8] To restrict liberal visitation, DSHS must prove that visitation poses a current concrete risk to the child. *Tyler L.*, 150 Wn. App. at 804. Harm to the child must create "'an actual risk, not speculation based on reports.'" *Id.* (quoting *In re Dep. of T.L.G.*, 139 Wn. App. 1, 17, 156 P.3d 222 (2007)). If the evidence supports the conclusion that visitation will harm the child, the statute does not require an express finding that a visitation limitation is necessary to protect the child's health, safety, or welfare. *In re Dep. of T.H.*, 139 Wn. App. 784, 794-95, 162 P.3d 1141 (2007). "[The statute] places the burden on the agency to encourage maximum parent-child contact and to prove that visitation poses a current concrete risk to the children." *T.L.G.*, 139 Wn. App. at 17-18.

Here, DSHS is correct in its recitation of the law regarding the burden of proof that it bears in order to limit or deny a parent's visitation rights with their children. However, DSHS's "actual risk of harm" argument and reliance on RCW 13.34.136(2)(b)(ii) is misguided for three reasons.

First, as explained above, the evidence at trial demonstrated that DSHS *did* have the discretion to change visitation location. And the February 1 dependency court orders neither

___

[8] RCW 13.34.136 was amended in 2022, but those amendments are not material here. Therefore, we cite to the current version of the statute.

specified a visitation location nor circumscribed DSHS's discretion to change visitation location. Thus, evidence does not support proposed instruction 27.

Second, the Coxes never claimed that supervised visits should been limited or denied so as to have the statute apply. Rather, the Coxes argued that DSHS was negligent in: (1) assessing the risk of harm Powell posed to the boys in regard to supervised visitation; (2) allowing visitations to occur at Powell's rental house; (3) organizing, conducting, supervising, and facilitating visitations; and (4) through its negligence, DSHS failed to protect the boys from foreseeable harm. Stated another way, the Coxes argued that DSHS was negligent in the *manner* in which visitations were conducted—not that visitations should have be limited or denied. Therefore, proposed instruction 27 is immaterial and would have misled the jury of the applicable law.

Third, proposed instruction 27 would have misinformed the jury of the applicable law in another way. As explained above, RCW 13.34.136(2)(b)(ii) is inapplicable under these circumstances because that statute deals with the permanency plan of care. There was no permanent plan in place for this statute to even apply.

We hold that the trial court did not abuse its discretion in denying proposed instruction 27 because that instruction is not supported by the evidence and would have misinformed the jury of the applicable law.[9]

G.    DSHS's Proposed Special Verdict Form

DSHS also argues that the trial court erred in failing to give its proposed a special verdict form that incorporated questions consistent with proposed instruction 24, proposed supplemental instruction 15, and proposed instructions 26 and 27. Br. of Appellant at 70, 77. For the same

---

[9] For this reason, DSHS's reliance on *Segaline v. Dep't of Labor & Indus.*, 199 Wn. App. 748, 400 P.3d 1281 (2017), and its constitutional arguments to the contrary are without merit.

reasons discussed above that the trial court did not err in failing to give DSHS's proposed instructions, we hold that the trial court did not err in failing to give DSHS's proposed special verdict form.

### H. Jury Instruction 12

DSHS also assigns error to jury instruction 12, which set forth the Coxes' negligence claims. DSHS claims that the trial court erred in instructing the jury on a negligence theory for which there was no evidence of causation. Because the trial court did not err in denying DSHS's CR 50 motion for a directed verdict based on superseding cause, we also hold that the trial court did not err in giving instruction 12.

## II. PRINCIPAL-AGENT RELATIONSHIP

DSHS argues that the trial court erred in giving instruction 6 because it improperly imposed a principal-agent relationship on DSHS for the acts and omissions of FCRN and its employees (Griffin-Hall) as a matter of law when the issue of agency was a disputed question of fact for the jury to resolve. DSHS also contends that, by deciding an issue of fact as a matter of law, instruction 6 amounted to an impermissible comment on the evidence in violation of article IV, section 16 of the Washington Constitution. In this same vein, DSHS argues that the trial court erred in failing to give its proposed supplemental instructions 41, 42, and 43 because those instructions would have allowed the jury to decide the disputed questions of fact pertaining to FCRN's and Griffin-Hall's agency status.

We hold that the trial court did not err in giving instruction 6 and denying proposed supplemental instructions 41, 42, and 43 because agency was properly imposed as a matter of law.

A.     Standard of Review

Whether to give a specific instruction is within the discretion of the trial court, therefore, we review such decisions for an abuse of discretion. *Taylor*, 187 Wn.2d at 767. A trial court abuses its discretion when its ruling is manifestly unreasonable or based on untenable grounds. *Bengtsson*, 14 Wn. App. 2d at 99. "Jury instructions are generally sufficient if they are supported by the evidence, allow each party to argue its theory of the case, and when read as a whole, properly inform the trier of fact of the applicable law." *Fergen*, 182 Wn.2d at 803. The facts of the case govern the propriety of a jury instruction. *Id*. The trial court is under no obligation to give a misleading instruction. *Jaeger*, 148 Wn. App. at 716. Likewise, a trial court is not required to give a proposed instruction if the instruction does not properly state the law or the evidence does not support it. *Ager*, 128 Wn.2d at 93.

However, "[w]e review alleged legal errors in a jury instruction de novo." *Walter v. Spee W. Constr. Co*, 21 Wn. App. 2d 204, 210, 504 P.3d 878 (2022). "When a jury instruction erroneously states the law and prejudices a party, we must reverse." *Hendrickson v. Moses Lake Sch. Dist.*, 192 Wn.2d 269, 281, 428 P.3d 1197 (2018). "'Prejudice is presumed if the instruction contains a clear misstatement of the law; prejudice must be demonstrated if the instruction is merely misleading.'" *Id*. (quoting *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 860, 281 P.3d 289 (2012)).

B.     Instruction 6 Does Not Contain a Clear Misstatement of the Law

The trial court provided instruction 6 to the jury, which states that,

> [FCRN] (and its employees, including [] Griffin-Hall) was the agent of [DSHS], and, therefore, any act or omission of the agent, including its employees, was the act or omission of [DSHS].

CP at 8131.

DSHS argues that the trial court erred in giving instruction 6 because it erroneously imposed an agency relationship between it, FCRN, and Griffin-Hall as a matter of law when the issue of agency was a disputed question of fact for the jury to resolve. We hold that the trial court did not err by imposing agency as a matter of law in instruction 6.

The general rule is that a principal may be held accountable for the actions of its agent. *Thornell v. Seattle Serv. Bureau, Inc.*, 184 Wn.2d 793, 803, 363 P.3d 587 (2015). However, a principal will generally avoid liability for harm caused by the actions of an independent contractor. *Wilcox v. Basehore*, 187 Wn.2d 772, 789, 389 P.3d 531 (2017). To determine whether a relationship between two entities engaged in a business agreement "is a principal-agent relationship or an 'independent contractorship[,] . . . the most crucial factor is the right to control the details of the work.'" *Id*. (quoting *Larner v. Torgerson Corp*., 93 Wn.2d 801, 804-05, 613 P.2d 780 (1980)). If the principal does not retain a right to control the other entity's work, then that other entity is an independent contractor. *Id*. at 790.

Generally, "'[t]he existence of a principal-agent relationship is a question of fact.'" *Afoa v. Port of Seattle*, 191 Wn.2d 110, 125, 421 P.3d 903 (2018) (quoting *Uni-Com Nw., Ltd. v. Argus Publ'g Co*., 47 Wn. App. 787, 796, 737 P.2d 304 (1987)). Whether an entity is an agent or an independent contractor "'can only be decided as a matter of law where there are no facts in dispute and the facts are susceptible of only one interpretation.'" *Wilcox*, 187 Wn.2d at 790 (quoting *Graves v. P.J. Taggares Co*., 94 Wn.2d 298, 302-03, 616 P.2d 1223 (1980)).

Here, DSHS asserts the issue of control is disputed because it did not have the right to direct the details of FCRN's and Griffin-Hall's work. As evidence to support this claim, DSHS offered the contract between it and FCRN, which expressly disclaimed that FCRN or its employees were employees or agents of DSHS but were instead independent contractors.

The Coxes respond that the issue of control and contracting status of FCRN and Griffin-Hall is irrelevant because the Supreme Court's decision in *H.B.H.*, 192 Wn.2d 154, imposes a principal-agent relationship as a matter of law whenever DSHS delegates its duty to protect dependent children from foreseeable harm. While we disagree with DSHS, we also hold that *H.B.H.*'s agency analysis is inapplicable here.

In *H.B.H.*, the Supreme Court recognized a common law duty requiring DSHS to protect foster children from abuse based on a special relationship exception to the general rule that a party is not required to protect against the criminal acts of a third party. 192 Wn.2d at 178. There, the court explained that "[w]hen the court places a dependent child with DSHS, as in this case, DSHS is the sole legal custodian of the child. . . . The transfer of legal custody charges DSHS with the following duties: . . . (2) protecting . . . the child." *Id*. at 166. The court recognized that "DSHS retains the right to designate agents to carry out certain duties granted to it as a result of the transfer of legal custody." *Id*. On this point, the court expressly rejected the notion that foster parents were independent third parties. *Id*. at 167 n.4. Instead, without conducting a traditional agency analysis, the court stated that "[foster parents] are instead *agents* of DSHS, who carry out the day-to-day responsibilities entrusted to DSHS in its role as the legal custodian of dependent children." *Id*. at 167 n.4 (emphasis added).

Here, *H.B.H.* restated the well-established principle that DSHS has a duty to protect a dependent child when that child is placed in its care, custody, and control. 192 Wn.2d at 166 (discussing JuCR 3.8(e)). That duty plainly applied to DSHS in this case because on February 1, 2012, the court ordered that both of the boys remain in the care and custody of DSHS while authorizing relative placement with the Coxes. But we need not reach the agency analysis in

*H.B.H.* because this case does not involve foster parents as *H.B.H.* did and is therefore distinguishable on its facts.

Rather than rely on *H.B.H.*, we apply long standing agency principles to conclude that DSHS is liable for its failure to protect the boys. Whether FCRN and Griffin-Hall also had a duty is immaterial. As discussed above, along with the transfer of legal custody, section 3.14 of the February 1 dependency orders required DSHS to continue providing supervised visitations for Powell: "Two visits each week, three hours each minimum, supervised by [DSHS] or [DSHS] approved person. Visits may be expanded upon agreement of the GAL and social worker." Ex. 257 at 7; Ex. 258 at 7. True, DSHS entered into a contract with FCRN and Griffin-Hall to provide supervised visitation services. But, DSHS was without authority to absolve itself of the duty placed upon it by the dependency court. Any contract it had with FCRN operated as a risk management vehicle as between it and FCRN only, but did not nullify the duty placed on DSHS by the court—a duty consistent with that observed by our Supreme Court in *H.B.H.* under JuCR 3.8(e). And while section 3.14 of the dependency orders permitted DSHS *or* a DSHS approved person to supervise visits, this part of the dependency orders did not negate DSHS's duty to protect because DSHS was at all times C.J.P.'s and B.T.P.'s legal custodian.

And, as explained above, long standing agency principles resolve this issue in favor of the Coxes in any event. Given that the most crucial factor of an agency analysis is the right to control details of the work, we find it unfathomable that, had DSHS required that FCRN maintain close proximity to the boys at all times (rather than let them run ahead), or conduct visits in a secured facility (reasonable measures in light of the facts DSHS knew), that FCRN could have refused DSHS's control of these details of supervision services. Of course DSHS had the right to control these details of FCRN's work.

We conclude that while visitations could be supervised by DSHS or a DSHS approved person, DSHS still retained the duty to protect C.J.P and B.T.P. based on the transfer of legal custody to DSHS in the dependency orders. Thus, while agency generally asks whether the principal retained the right to control the details of the agent's work, which is a question of fact, here, DSHS *always* had the right to direct the details of FCRN's and Griffin-Hall's work because of the dependency orders at issue. Accordingly, the trial court properly imposed a principal-agent relationship as a matter of law.

Next, DSHS argues that instruction 6 amounts to an improper comment on the evidence because the trial court decided agency as a matter of law when the issue of control was disputed, which is a question of fact. We disagree.

The Washington Constitution does not allow judges to "charge juries with respect to matters of fact, nor comment thereon." WASH. CONST. art. IV, § 16. Instead, they "shall declare the law." *Id*. "'A jury instruction that does no more than accurately state the law pertaining to an issue, however, does not constitute an impermissible comment on the evidence by the trial judge.'" *State v. Brush*, 183 Wn.2d 550, 557, 353 P.3d 213 (2015) (quoting *State v. Woods*, 143 Wn.2d 561, 591, 23 P.3d 1046 (2001)).

Here, consistent with the analysis above, the trial court did not improperly comment on a matter of fact because the issue of agency turned on the legal effect of the February 1 dependency orders. Because "[t]he interpretation of a court order is a question of law," it is not a question of fact for the jury to resolve. *State v. Ayala-Pineda*, 23 Wn. App. 2d 863, 870, 520 P.3d 463 (2022). Accordingly, this argument fails.

DSHS next argues that instruction 6 is inconsistent with *H.B.H.* because it imposes liability without limit and imposes vicarious liability without a finding that DSHS itself was negligent. We

conclude that DSHS's argument fails because, as discussed above, *H.B.H*'s agency analysis is inapplicable here as this case has nothing to do with foster parents.

We hold that the trial court did not err in giving jury instruction 6 because it did not contain a clear misstatement of the law.

C.      Proposed Supplemental Instructions 41-43—Agency and Independent Contractors

DSHS argues that the trial court erred in failing to give its proposed supplemental instructions 41, 42, and 43 because those instructions would have allowed the jury to decide the disputed questions of fact pertaining to FCRN's and Griffin-Hall's agency status.  We disagree.

Here, as explained above, the trial court did not err by instructing the jury that FCRN and Griffin-Hall were agents of DSHS as a matter of law.  Therefore, the trial court did not err in denying DSHS's proposed supplemental instructions 41-43 as those instructions would have misled and confused the jury.  Accordingly, this argument fails.

D.      Special Verdict Form

Because DSHS's arguments relating to instruction 6 and proposed supplemental instruction 41-43 fail, we also conclude the trial court did not err in refusing to give DSHS's proposed special verdict form, which would have asked the jury to answer whether Griffin-Hall was an agent of the DSHS and whether she acted negligently during the visitation that led to the boys' deaths.

III.    LAWYER'S DUTY TO DISCLOSE CLIENT INFORMATION TO PREVENT SUBSTANTIAL BODILY HARM OR A CRIME

DSHS assigns error to the trial court's failure to give its proposed supplemental instruction 40.  We decline to address the issue.

For an issue to be considered on appeal, an appellant must raise the issue in the assignments of error, present an argument on the issue, and provide some legal citation.  *Cook*, 158 Wn. App. at 794; RAP 10.3(a)(6).  An appellant waives an assignment of error by failing to argue it in its

opening brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Here, DSHS fails to provide any argument as to how the trial court abused its discretion in denying proposed supplemental instruction 40 in its opening brief. Accordingly, the assignment of error is waived.

Regardless, even if the issue was not waived, the trial court did not abuse its discretion in denying proposed supplemental instruction 40 because there was no evidence that any of the social workers or the GAL relied on the silence of Judge Bassett in their acts or omissions during the dependency. Accordingly, even if we reached the issue, the argument would fail.

IV.     EVIDENTIARY RULINGS

DSHS argues that the trial court abused its discretion in excluding evidence that was relevant to its superseding cause defense, such as: (1) testimony from the dependency court judge; (2) Powell's attorney for the dependency proceedings; (3) the transcripts from the dependency and nonparental custody hearings; and (4) the January 2012 GAL report. DSHS contends that the exclusion of the aforementioned evidence was not harmless error and requires a new trial. We disagree.

A.     Legal Principles

We review the trial court's evidentiary rulings for an abuse of discretion. *Spencer v. Badgley Mullins Turner, PLLC*, 6 Wn. App. 2d 762, 784, 432 P.3d 821 (2018). The trial court "abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons." *Id*. "[We] can affirm an evidentiary ruling on any ground supported by the record." *Id*. at 785.

Generally, only relevant evidence is admissible. *Gorman v. Pierce County*, 176 Wn. App. 63, 84, 307 P.3d 795 (2013); ER 402. "Relevant evidence has any tendency to make a fact of consequence more likely or less likely; this definition sets a low threshold." *Gorman*, 176 Wn. App. at 84; ER 401. Evidence which is not relevant is not admissible. ER 402. The trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403. The trial court has "considerable discretion" in administering the ER 403 balancing test. *Carson v. Fine*, 123 Wn.2d 206, 226, 867 P.2d 610 (1994).

If we conclude that the trial court made an erroneous evidentiary ruling, "the question on appeal becomes 'whether the error was prejudicial, for error without prejudice is not grounds for reversal.'" *Mut. of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 728-29, 315 P.3d 1143 (2013) (quoting *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d 571 (1983)). "An error is prejudicial if 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *City of Seattle v. Pearson*, 192 Wn. App. 802, 817, 369 P.3d 194 (2016) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

B.      The Excluded Evidence is Irrelevant

The Coxes argue that excluded evidence is irrelevant because the February 1 dependency orders never directed a specific visitation location. We agree.

At trial, the Coxes introduced evidence and argued that DSHS failed to inform the dependency court about Powell's repeated violations of court orders and the fact that visitations were moved to Powell's rental house. Although the February 1 dependency court orders did not

direct visitation location, the excluded evidence, addressed below, was only relevant for the limited purpose of rebutting the Coxes' arguments as to what the court knew when it issued those orders. But again, as discussed above, the court's orders did not direct location of supervised visits— whether DSHS withheld information negligently is not a fact that is of consequence to the action. Accordingly, this argument fails.

We hold that the trial court did not abuse its discretion in excluding evidence that was relevant to DSHS's superseding cause defense because the February 1 dependency orders were not a superseding cause to the Coxes' negligence claims.

In sum, because DSHS's challenge to the CR 50 ruling, jury instructions, and evidentiary rulings fail, we affirm the jury's liability verdict finding that DSHS negligently failed to protect C.J.P. and B.T.P. from foreseeable harm and that such negligence was a proximate cause of their deaths.

THE COXES' CROSS-APPEAL

I.      REMITTITUR

The Coxes argue that the trial court erred in remitting the jury's damages award by two-thirds and, in the alternative, granting a new trial on damages because the jury's verdict was within the range of substantial evidence in the record and was not the result of passion and prejudice. We agree and reinstate the jury's verdict.[10]

A.      The Standard of Review is De Novo

As an initial matter, the parties disagree as to the applicable standard of review. The Coxes contend that de novo review applies because the trial court ordered a new trial pursuant to RCW

---

[10] Because we hold that the trial court erred in granting DSHS's motion for a new trial, and in the alternative a remittitur, we need not address DSHS's new trial arguments.

4.76.030. DSHS responds that, because the Coxes did not consent to the remittitur, "[t]he Supreme Court's recent decision in *Coogan v. Borg-Warner Morse Tec, Inc.*, 197 Wn.2d 790, 815, 490 P.3d 200 (2021), makes clear that the review of a trial court's order for a new trial is to be analyzed under an abuse of discretion standard." Br. of Cross-Resp't. at 80. We agree with the Coxes.

The legislature granted the trial courts of this state the authority to increase or reduce a jury's damage award as an alternative to a new trial through RCW 4.76.030. The statute provides that,

> If the trial court shall, upon a motion for new trial, find the damages awarded by a jury to be so excessive or inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice, *the trial court may order a new trial or may enter an order providing for a new trial unless the party adversely affected shall consent to a reduction or increase of such verdict*, and if such party shall file such consent and the opposite party shall thereafter appeal from the judgment entered, the party who shall have filed such consent shall not be bound thereby, *but upon such appeal the court of appeals or the supreme court shall, without the necessity of a formal cross-appeal, review de novo the action of the trial court in requiring such reduction or increase*, and there shall be a presumption that the amount of damages awarded by the verdict of the jury was correct and such amount shall prevail, unless the court of appeals or the supreme court shall find from the record that the damages awarded in such verdict by the jury were so excessive or so inadequate as unmistakably to indicate that the amount of the verdict must have been the result of passion or prejudice.

RCW 4.76.030 (emphasis added).

Washington courts have consistently held that the above statutory standard of review (de novo) applies when the trial court actually remits an award. *Bunch v. King County Dep't of Youth Servs.*, 155 Wn.2d 165, 176, 116 P.3d 381 (2005); *see also Ma v. Russell*, 71 Wn.2d 657, 658-59, 430 P.2d 518 (1967); *Collins v. Clark County Fire Dist. No. 5*, 155 Wn. App. 48, 88, 231 P.3d 1211 (2010); *Hill v. GTE Directories Sales Corp.*, 71 Wn. App. 132, 138, 856 P.2d 746 (1993); *Hendrickson v. Konopaski*, 14 Wn. App. 390, 394-95, 541 P.2d 1001 (1975). This is so because when the trial court remits an award it invades the constitutional province of the jury as the trier

46

of fact, thus making the less deferential standard of review (de novo) appropriate. *Bunch*, 155 Wn.2d at 176.

On the other hand, Washington courts have held that "[a]n abuse of discretion standard is appropriate where . . . the trial court refused remittitur." *Bunch*, 155 Wn.2d at 178; *see also Coogan*, 197 Wn.2d at 797-98, 806 (applying an abuse of discretion standard of review where the trial court denied defendant's motion for a new trial and, in the alternative, a remittitur of the jury's damage award).

In *Ma*, the Supreme Court made clear that, "[w]hile [RCW 4.76.030] does not expressly provide for an appeal by a *nonconsenting party* adversely affected by the order, the implication is clear that, on such an appeal . . . this statute governs the review of the order reducing the verdict." 71 Wn.2d at 659 (emphasis added). Therefore, under *Ma*, de novo review clearly applies even when a party rejects remittitur and the trial court orders a new trial pursuant to RCW 4.76.030.

Here, de novo review applies because the trial court actually remitted the jury's damage award pursuant to RCW 4.76.030. The fact that the Coxes rejected the remittitur does not change the applicable standard of review. *Ma*, 71 Wn.2d at 659. Additionally, DSHS's reliance on *Coogan* is inapposite because, unlike here, the trial court in that case *denied* the defendant's motion for a new trial which made the abuse of discretion standard appropriate. 197 Wn.2d at 797-98, 806. Because the trial court in this case actually remitted the award and ordered a new trial under RCW 4.76.030, the applicable standard of review is de novo.

B.      Legal Principles

"Respect for the jury's role in our civil justice system is rooted in Washington's constitution, which grants juries 'the ultimate power to weigh the evidence and determine the facts—and the amount of damages in a particular case is an ultimate fact.'" *Coogan*, 197 Wn.2d

at 810 (quoting *James v. Robeck*, 79 Wn.2d 864, 869, 490 P.2d 878 (1971)). This jury function receives constitutional protection from article 1, section 21 of the Washington Constitution. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 648, 771 P.2d 711 (1989).

"The jury's role in determining noneconomic damages is . . . essential." *Sofie*, 112 Wn.2d at 646. "The determination of the amount of damages, *particularly in actions of this nature* [pain and suffering], is primarily and peculiarly within the province of the jury, under proper instructions, and the courts should be and are reluctant to interfere with the conclusion of a jury when fairly made." *Bingaman v. Grays Harbor Comty. Hosp.*, 103 Wn.2d 831, 835, 699 P.2d 1230 (1985) (emphasis added). The jury is given "considerable latitude" in making damage determinations. *Kramer v. Portland-Seattle Auto Freight, Inc.*, 43 Wn.2d 386, 396, 261 P.2d 692 (1953). "'We strongly presume the jury's verdict is correct.'" *Coogan*, 197 Wn.2d at 810 (quoting *Bunch*, 155 Wn.2d at 179).

"In narrow circumstances, that strong presumption can be overcome." *Coogan*, 197 Wn.2d at 810. Those circumstances are met if (1) the award is outside the range of substantial evidence in the record, (2) shocks the conscience of the court, or (3) appears to have been arrived at as the result of passion or prejudice. *Mut. of Enumclaw Ins. Co.*, 178 Wn. App. at 726; RCW 4.76.030. Our Supreme Court has explained that "the substantial evidence inquiry is the threshold question, before turning to the question of excessiveness." *Coogan*, 197 Wn.2d at 814 n.3.

"'Where the proponent of a new trial argues [that] the verdict was not based upon the evidence, appellate courts will look to the record to determine whether there was sufficient evidence to support the verdict." *Coogan*, 197 Wn.2d at 811-12 (quoting *Palmer v. Jensen*, 132 Wn.2d 193, 197-98, 937 P.2d 597 (1997)). Under this analysis, "the court is required to view the evidence and reasonable inferences in the light most favorable to the verdict, without regard to

contrary evidence or inferences." *Id*. at 812. We owe no deference to the trial court's conclusions. *Id*. However, we must show appropriate deference to the jury's constitutional role as the ultimate finder of fact. *Id*. In the case of noneconomic damages, "[t]here is no legal standard for determining the length of [pain and] suffering needed to support significant damages, especially where that suffering is severe and involves an awareness of impending death." *Id*. at 818.

"[T]he passion or prejudice inquiry and the shocks the conscience inquiry ask essentially the same question: Did the jury base its verdict on some malign influence or egregious impropriety at trial rather than the properly admitted evidence?" *Id*. at 813. If substantial evidence in the record does not support the verdict, then that can lead to the conclusion that the award was the result of passion and prejudice and shocks the court's conscience. *See Id*. at 814; *Hill*, 71 Wn. App. at 140. Otherwise, courts can order a new trial only if something in the record unmistakably indicates that the verdict was based on some improper consideration that gives rise to passion or prejudice, or that otherwise shocks the court's conscience. *Coogan*, 197 Wn.2d at 814. That is, "there must be something in the record showing that the jury's verdict was improperly influenced by 'untoward incidents of such extreme and inflammatory nature that the court's admonitions and instructions could not cure or neutralize them.'" *Id*. (quoting *James*, 79 Wn.2d at 871). "The size of the verdict alone cannot be proof that it was based on passion, prejudice, or any other improper consideration." *Id*. at 813.

If the verdict is supported by substantial evidence and the record does not clearly indicate that the verdict resulted from passion or prejudice or was so beyond the bounds of justice that no reasonable person could believe it is correct, then we must reinstate the jury's verdict in full. *Id*. at 820.

C.    The Jury's Damage Award is Within the Range of Substantial Evidence in the Record

The Coxes argue that the trial court erred in concluding that the jury's damage award was not within the range of substantial evidence in the record. We agree.

Here, there is substantial evidence supporting a significant award of noneconomic damages based on the horrific and brutal deaths that both C.J.P. and B.T.P. endured at the hands of their own father, Powell. Dr. Wecht's testimony demonstrated the severe physical pain and suffering that the boys experienced. His testimony showed that Powell first stuck both of the boys in the neck and head area with a hatchet multiple times. This was right after he had told boys to "[l]ay facedown" because he had a "surprise" for them—suggesting this was meant to be some sort of execution. 20 RP (Mar. 11, 2020 PM) at 1421. The hatchet strikes left C.J.P. paralyzed from the upper chest down, obliterated the back of B.T.P.'s skull, and even left a small sliver of metal in the back of B.T.P.'s neck. However, both of the boys remained conscious after the hatchet attack. Dr. Wecht's testimony demonstrated that Powell then doused both of the boys with gasoline while they were alive and conscious, and lit them on fire. Both of the boys had swallowed some of the gasoline in the process, and presumably, some also penetrated their hatchet wounds. Both of the boys then laid in the house inhaling hot, toxic soot from the fire until they lost consciousness and ultimately succumbed to CO poisoning. Accordingly, there was substantial evidence demonstrating severe physical pain and suffering.

Dr. Adler's testimony put into evidence the emotional component of boys' the pain and suffering. His testimony demonstrated the abject fear, confusion, and betrayal the boys felt as they witnessed their own father mortally attack them and witnessed the same pain inflicted upon their sibling. Additionally, Dr. Adler opined that the boys were already predisposed to emotional harm based on Susan's disappearance and events thereafter in Washington, which likely heightened the

pain and suffering they endured during the attack. This was indeed an exemplary case because Dr. Adler testified that, even given his line of work as a forensic and clinical psychiatrist, he had "never encountered such an abject, sadistic, horrific, terrorizing experience" that the boys must have endured—it was "almost beyond human comprehension." 11 RP (Feb. 24, 2020 AM) at 509. Accordingly, there was substantial evidence demonstrating severe emotional pain and suffering.

The damages were also within the range of substantial evidence in the record. On appeal, the parties appear to agree that the boys tragically suffered for 22 minutes before the rental house ignited. However, the record does not support that the boys' *conscious* pain and suffering actually lasted that long. When viewing the evidence in the light most favorable to the Coxes, Dr. Wecht's testimony established that the boys experienced pain and suffering for up to 9 minutes before losing consciousness to CO poisoning—beginning at the time the front door slammed on Griffin-Hall. At trial, counsel for the Coxes suggested that $5 million for every minute of conscious pain and suffering would be a reasonable benchmark to compensate each estate for their noneconomic damages. The jury then returned a verdict totaling $115 million for both estates, which was reduced to judgment in the amount of $98,509,000 (or $49,254,500 per estate) after segregating the damages proximately caused by Powell's intentional acts. Thus, the jury here awarded each estate approximately $5,472,722.22 per minute of conscious pain and suffering, which appears to follow the Coxes' suggested range of damages.

As explained above, "[t]he determination of the amount of damages, particularly in actions of this nature [pain and suffering], is primarily and peculiarly within the province of the jury, under proper instructions, and the courts should be and are reluctant to interfere with the conclusion of a jury when fairly made." *Bingaman*, 103 Wn.2d at 835. And the jury is given "considerable latitude" in determining the amount of damages. *Kramer*, 43 Wn.2d at 396. Based on the above,

51

we conclude that the jury's damage award was within the range of substantial evidence in the record.

> D.     Nothing in the Record Unmistakably Shows that the Jury's Damage Award Resulted from Passion and Prejudice or Shocks the Conscience of the Court

The Coxes argue that the trial court erred in concluding that the jury's damage award was obviously the result of passion or prejudice because nothing in the record shows that the jury was motivated by some malign influence or egregious impropriety at trial. We agree.

Here, having concluded that the jury's damage award was within the range of substantial evidence in the record, "'it cannot be found as a matter of law that the verdict was unmistakably so excessive or inadequate as to show that the jury had been motivated by passion or prejudice solely because of the amount.'" *Coogan*, 197 Wn.2d at 814 (quoting *James*, 79 Wn.2d at 870-71). Instead, DSHS must show that there is something in the record indicating that the jury's verdict was improperly influenced by "'untoward incidents of such extreme and inflammatory nature *that the court's admonitions and instructions could not cure or neutralize them.*'" *Coogan*, 197 Wn.2d at 814 (emphasis added) (quoting *James*, 79 Wn.2d at 871).

DSHS fails to make this showing. In fact, DSHS's passion and prejudice argument appears to rest on the assumption that the jury's damage award was *not* within the range of substantial evidence in the record. It fails to allege anything in the record unmistakably showing that the jury's damage award was arrived at as a result of passion and prejudice.

DSHS appears to claim that the verdict was the product of passion and prejudice because the damages awarded were too high per minute. But "[t]he determination of the amount of damages, particularly in actions of this nature [pain and suffering], is primarily and peculiarly within the province of the jury." *Bingaman*, 103 Wn.2d at 835. And the jury is given "considerable latitude" in determining the amount of damages. *Kramer*, 43 Wn.2d at 396. Stated another way,

52

there is simply no fixed standard to determine noneconomic damages—such determinations are strictly within the jury's discretion. Additionally, DSHS cannot now complain that the damages were too high per minute when it failed to provide any argument to the contrary to guide the jury's damage decisions. All the jury had was the evidence, their human experience, and the suggested range by the Coxes' counsel. Accordingly, this argument fails.

Next, DSHS appears to argue that the verdict was a product of passion and prejudice because the economic loss the boys suffered—based on the estimate provided by the Coxes' economist—was highly disproportionate to the noneconomic loss the jury awarded. DSHS relies on *Hill*, 71 Wn. App. 132, to support its argument. We disagree.

In *Hill*, Division Three of this court affirmed the trial court's order remitting the jury's economic and noneconomic damages award for the plaintiff. 71 Wn. App. at 139-40. There, the court affirmed the remittitur for the economic damages award because it was "clearly outside the range of the evidence." *Id*. at 139. The court affirmed the remittitur for the noneconomic damages award reasoning that, "[i]*n light of the meager evidence and the jury's award of excessive economic damages . . .* we agree the [noneconomic damages] award clearly indicates passion or prejudice, or an attempt to award punitive damages." *Id*. at 140.

Here, *Hill* is inapposite to these circumstances because the jury was not asked to, and did not, award economic damages. Thus, there is no excessive economic damages award that would indicate that passion or prejudice influenced the jury's noneconomic damages award. Additionally, the damages evidence here was not meager, but substantial, as explained above. Accordingly, DSHS's reliance on *Hill* fails and all that remains is the size of the verdict. But size of the verdict alone is not a basis to find passion and prejudice. *Coogan*, 197 Wn.2d at 813.

"There is no legal standard for determining the length of [pain and] suffering needed to support significant damages, especially where [as here] that suffering is severe and involves an awareness of impending death." *Id*. at 818. DSHS's challenge to the sufficiency of the evidence to support the verdict fails and there is nothing in the record unmistakably showing the jury's verdict was based on some improper consideration instead of the legally sufficient evidence. Thus, in setting aside the damages verdict, the trial court intruded on the jury's constitutional prerogative, and impermissibly based its decision on the size of the verdict and its own subjective reweighing of the evidence. Accordingly, we reverse the trial court's January 6 order and reinstate the jury's damages award in full.

## CONCLUSION

We affirm the jury's liability verdict finding that DSHS negligently failed to protect C.J.P. and B.T.P. from foreseeable harm and that such negligence was a proximate cause of their deaths. However, we reverse the trial court's January 6 new trial order and reinstate the jury's damage award in full.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Maxa, J.

_____
Cruser, A.C.J.